### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| IN RE: SUBOXONE (BUPRENORPHINE | : | MDL NO. 2445 |
| HYDROCHLORIDE AND NALOXONE) | : | 13-MD-2445 |
| ANTITRUST LITIGATION | : | |

_____ :
                                        :
THIS DOCUMENT APPLIES TO:               :
ALL ACTIONS                             :
_____ :

**Goldberg, J.**                                          **December 3, 2014**

### MEMORANDUM OPINION

This multidistrict litigation raises the following question: can a pharmaceutical company marketing brand-name prescription drugs be subject to antitrust liability for engaging in what has been referred to as a "product hopping" scheme?  Plaintiffs urge that the answer to this question is "yes," and allege that as the period of exclusivity on the brand-name drug, Suboxone, expired and generic versions of that drug were to become available, Reckitt Benckiser, Inc. effectuated inconsequential changes to the Suboxone dosage form to prevent competition from generic formulations.  More specifically, Plaintiffs, the Direct Purchasers of Suboxone ("Direct Purchasers") and the End Payors of Suboxone ("End Payors") claim that Reckitt and its affiliates ("Reckitt") switched from sublingual Suboxone tablets to a sublingual Suboxone film for the purpose of stymying generic competition.  This switch was allegedly accompanied by Reckitt falsely disparaging the tablet through fabricated safety concerns and ultimately removing Suboxone tablets from the market just as generic Suboxone tablets were able to begin competing.  Reckitt is also alleged to have manipulated FDA regulations to delay the entry of generic Suboxone onto the market, thereby unlawfully maintaining a monopoly in violation of § 2 of the

Sherman Act and state law. According to Plaintiffs, Reckitt's conduct negatively affected competition and resulted in ongoing overpayments by consumers.

Before me is Reckitt's motion to dismiss which essentially argues that Plaintiffs' complaint describes nothing more than new product development and marketing. Reckitt is correct that the development and marketing of new products is typically viewed as procompetitive. However, due to market characteristics unique to the pharmaceutical industry, I conclude that some of Plaintiffs' claims do plausibly allege antitrust violations and should survive Defendants' motions to dismiss. This opinion explains the bases for my ruling.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The facts alleged by Plaintiffs are as follows:[1] Suboxone (Buprenorphine Naloxone or "BPN/NLX") is a prescription drug used for the maintenance treatment of opioid dependence. It is the only pharmaceutical on the market that provides maintenance treatment for patients suffering from opioid addiction that can also be prescribed in an office setting for the patient's home use. All other opioid addiction maintenance treatments, such as methadone, can only be dispensed at a clinic. Suboxone has been approved for home use because it is co-formulated to help prevent abuse, containing both: (1) buprenorphine, an opioid which treats the withdrawal symptoms; and (2) naloxone, an opioid antagonist, which causes the immediate onset of withdrawal symptoms if the product is inappropriately melted and injected. Today, Suboxone

---

[1] The Direct Purchasers' and the End Payors' complaints contain almost identical allegations. To avoid confusion, the facts recited herein will be derived from the Direct Purchasers' consolidated amended complaint. Where the allegations in the complaints differ, I will distinguish accordingly. In reviewing Defendants' motion to dismiss, I assume that all facts found in the consolidated amended complaints are true, and to the extent any facts from outside the amended complaints are recited, they are referenced for informational purposes only. See Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 225 n.1 (3d Cir. 2013).

has annual sales of over one billion dollars and accounts for 20% of Reckitt's profits.  (DP Compl. ¶¶ 5, 74-77.)

Under the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301, et seq., a manufacturer that creates a new drug must obtain the approval of the Food and Drug Administration ("FDA") to sell the drug by filing a New Drug Application ("NDA").  Under the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417 (1984), commonly known as the Hatch-Waxman Act, certain pioneer drugs can gain periods of exclusivity. However, Hatch-Waxman also simplified the process by which generic manufacturers can compete with brand-name drugs on the market through the filing of an Abbreviated New Drug Application ("ANDA").   For example, Hatch-Waxman eliminated the need for generic manufacturers seeking ANDA approval to duplicate clinical studies that had already been performed by a bioequivalent brand-name drug manufacturer.  (Id. at ¶¶ 38-42.)

In order for a drug to be deemed bioequivalent, the generic product must be shown to deliver the same amount of active ingredient into a patient's blood stream for the same amount of time as the brand-name drug.  ANDA filers demonstrating bioequivalence generally seek to have their product deemed "AB-rated" to the brand-name drug.  This rating means that in addition to being bioequivalent, the two drugs are also pharmaceutically equivalent—which includes such considerations as having the same active ingredient, the same strength, the same route of administration and the same dosage form.  A pharmacy may not substitute a generic drug for a brand-name drug unless the generic is AB-rated.  (Id. at ¶¶ 42-44.)

Competition from low cost AB-rated generic drugs saves consumers billions of dollars a year.  When an AB-rated generic drug enters the market, the brand-name company often suffers a rapid, steep decline in sales—on average 80% within the first year.   AB-rated generic

competition enables direct and indirect purchasers to obtain both the generic drugs and the brand-name drugs at substantially lower prices.  (Id. at ¶¶ 9, 51, 55.)

The FDA approved Reckitt's NDA for Suboxone tablets in 2002.  Although Reckitt did not have a patent for Suboxone tablets, it was able to obtain a seven-year period of exclusivity from the FDA because Suboxone was found to be an orphan drug.[2]  Reckitt's period of exclusivity for Suboxone tablets was scheduled to expire on October 8, 2009.  (Id. at ¶¶ 78-80.) Plaintiffs allege that Reckitt, knowing its period of exclusivity would soon be over, began developing Suboxone film and obtaining patent protection for this new product.  Reckitt's actions while developing and marketing its new product are described as a "product-hopping scheme" and are alleged to be anticompetitive with the aim of maintaining Reckitt's monopoly in the Suboxone market.

## A. Description of Alleged Conduct

### 1. Product-Hopping: Development of Suboxone Film and the Alleged Destruction of the Tablet Market

The NDA for Suboxone film was submitted on October 20, 2008 and was approved August 30, 2010.  The patent for Suboxone film—patent 8,017,150 ("the '150 patent")—expires September 2023.  Generic Suboxone tablets cannot be AB-rated to branded Suboxone film due to the differences in dosage form—that is, sublingual tablet versus sublingual film.  Therefore, a pharmacist cannot provide a patient with generic Suboxone tablets when a patient has a prescription for Suboxone film.  (Id. at ¶¶ 81, 88.)

---

[2] The complaint indicates that orphan drug exclusivity may be granted: "(a) on the basis that a product is intended to treat a disease or condition that has a U.S. prevalence of less than 200,000 persons; or (b) where the sponsor can show that there is no reasonable expectation that the costs of developing and making available the drug will be recovered from U.S. sales, despite the fact that the product treats a disease or condition that has a U.S. prevalence of 200,000 or more individuals."  The FDA found that the latter of these considerations applied to Suboxone.  (Id. at ¶ 79.)

Plaintiffs allege that there are few differences between Suboxone film and Suboxone tablets, and that the film is not superior to the tablets.  In support of this assertion, Plaintiffs claim that the two products are so similar that Reckitt submitted safety and efficacy studies performed on Suboxone tablets when seeking approval of the Suboxone film NDA.  The two products are alleged to have equivalent bioavailability, meaning that the products release the same amount of active ingredients into a patient's bloodstream.  Although Reckitt indicated in its NDA that the film's individual packaging reduced the risk for accidental pediatric exposure to the drug, Plaintiffs assert that the evidence provided by Reckitt on this issue was flawed.  Indeed, Plaintiffs argue that the film may present increased risk for accidental pediatric exposure because the filmstrip dissolves more quickly than the tablet, and therefore may be more difficult for a child to spit out in the event of exposure.  Plaintiffs also allege that the film has a higher risk of abuse than the tablets.  (Id. at ¶¶ 82-86, Exs. A, B.)

Plaintiffs explain that once the FDA approved the Suboxone film NDA in 2010, Reckitt launched a fraudulent sales and marketing campaign against the tablet for the purpose of diverting sales from the tablet, which would soon face generic competition, to the patent-protected film.  Reckitt sales associates allegedly met with physicians and, in addition to promoting Suboxone film, disparaged Suboxone tablets and warned of false safety concerns.  It is also alleged that Reckitt publicly announced the removal of Suboxone tablets from the market for these fabricated safety reasons, although it did not actually remove the tablets until six months later—once the generic Suboxone ANDAs obtained FDA approval.  Reckitt also reportedly raised the price of its tablets in relation to the film formulation despite the fact that the film was more expensive to manufacture and package.  Plaintiffs conclude that Reckitt was

successful in its scheme, and had managed to convert 64% of all Suboxone prescriptions from tablet to film by the end of 2012.  (Id. at ¶¶ 89-92.)[3]

## 2. Reckitt Allegedly Delayed ANDA Approvals by Feigning Cooperation in the REMS Process

On December 22, 2011, the FDA approved a Risk Evaluation and Mitigation Strategy ("REMS")[4] performed by Reckitt on the issue of the risk of pediatric exposure to Suboxone tablets.  Through the REMS, the FDA required that Reckitt address pediatric exposures via FDA-approved labeling.  (DP Compl. ¶ 99.)

Pharmaceutical companies Actavis, Inc. and Amneal ("the Generics") filed ANDAs for generic Suboxone tablets in 2009 and May 2011 respectively.  On January 6, 2012, the FDA sent all sponsors of pending ANDAs for Suboxone tablets a notification letter stating that all branded and generic Suboxone products would be subject to a Single Shared REMS program ("SSRS"). ANDA filers were directed to contact Reckitt to collaborate on the creation of an SSRS program. The FDA gave a compliance date of May 6, 2012 for the SSRS.  Plaintiffs explain that the FDA gave a short turn-around time, assuming that the recently approved REMS performed by Reckitt would simply be amended to add the bioequivalent generic products.  (Id. at ¶¶ 98-102.)

Plaintiffs allege that Reckitt used the SSRS as a means to undermine and delay generic entry by making unnecessary, unprecedented and unreasonable demands on the generic

---

[3] The End Payors allege that this number was closer to 85% by the time generic Suboxone tablets entered the market in February 2013.  (EP Compl. ¶ 4.)

[4] Under the FDA Amendments Act of 2007, the FDA has the authority to require drug manufacturers to conduct a Risk Evaluation and Mitigation Strategy ("REMS").  A REMS is a process by which a drug's manufacturer demonstrates to the FDA that the drug's benefits outweigh its risks.  "A REMS can include a medication guide, a package insert, and potential restrictions on the distribution of the drug."  If the FDA requires a generic to conduct a REMS, an ANDA will not be approved until the REMS process is completed.  (Id. at ¶¶ 57-58; Oral Arg. Tr. pp. 12-15.)

companies as a condition precedent to Reckitt's cooperation in the SSRS, despite the fact that such delay tactics are expressly prohibited by 21 U.S.C. § 355-1(f)(8).  Reckitt reportedly turned down numerous invitations to participate in meetings with the Generics, and refused to engage in substantive discussions until the Generics agreed to a number of conditions the Generics found unfavorable, including "an upfront agreement that all manufacturers would share the costs of product liability for future potential lawsuits."  It is further alleged that Reckitt refused to share non-public information from its REMS program until its demands were met.  (Id. at ¶¶ 105-06.)

The Generics complained to the FDA about Reckitt's alleged delay tactics and a meeting was held on June 18, 2012.  The FDA acknowledged during this meeting that it could not compel Reckitt to share its non-public REMS program, and suggested that the Generics develop a new SSRS without using Reckitt's information.   Although the FDA implored Reckitt and the Generics to work together in good faith and to not attempt to block or delay, Plaintiffs claim that Reckitt's obstructionist actions continued, and that Reckitt refused to cooperate unless the Generics agreed to provide Reckitt veto authority or a super-majority vote on all issues relating to the SSRS.  Two days before the SSRS was submitted, Reckitt allegedly argued for the first time that an important element of the REMS had been omitted and refused to sign the SSRS.  Ultimately, the Generics sought a waiver for approval of their Generics-only SSRS on October 3, 2012.  (Id. at ¶¶ 107-12.)

### 3.  Reckitt Allegedly Files a Sham Citizen Petition and Fraudulently Delays That Filing to Maximize Delay of Generic Tablet Approval

Plaintiffs explain that Reckitt publicly announced the withdrawal of Suboxone tablets from the market due to false safety concerns on September 25, 2012, just prior to the Generic REMS waiver request.  On that same date, Reckitt filed a Citizen Petition with the FDA for the alleged purpose of blocking approval of the pending Suboxone ANDAs on purported safety

grounds.  The Petition requested that the FDA take three actions: (1) refrain from approving any BPN/NLX NDA or ANDA for the treatment of opioid addiction that did not include a targeted pediatric exposure education program, a condition not required for branded Suboxone tablets; (2) refrain from approving applications for BPN/NLX for opioid addiction that lacked unit-dose packaging, which was also not a condition for the branded Suboxone tablets; and (3) not approve any BPN/NLX ANDA for addiction treatment until the FDA determined whether Reckitt had discontinued Suboxone tablets for safety reasons.  (Id. at ¶¶ 113-15.)

Plaintiffs urge that Reckitt's Citizen Petition was a sham because the FDA had no statutory or regulatory authority to grant much of the relief requested.  For example, the FDA has no authority to require ANDA filers to mimic non-approved labeling and REMS materials in order to obtain ANDA approval.[5]  Nonetheless, Reckitt requested that ANDA filers seeking approval for generic Suboxone be required to include a pediatric exposure education program that was not part of the FDA-approved REMS or labeling for Suboxone tablets.  Further, Reckitt's request for an FDA investigation into the removal of Suboxone tablets from the market is alleged to be a sham because Reckitt had not withdrawn Suboxone tablets from the market at the time the request was made.  Plaintiffs also argue that Reckitt's request that all ANDA filers be required to use unit-dose packaging is a sham because Reckitt continued to sell Suboxone tablets in bulk packaging during that time period.  Finally, the FDA found that the study in Reckitt's Citizen Petition—which Reckitt argued supported its unit-dose packaging argument— acknowledged that it had insufficient information from which to draw definitive conclusions. (Id. at ¶¶ 117-31.)

---

[5] See 21 U.S.C. § 355(j)(4)(G); 21 C.F.R. § 314.127(a)(7).

In addition to alleging that the Citizen Petition was a sham, Plaintiffs also argue that it included a false certification regarding its timeliness and support.  Citizen Petitions require the filer to certify when they first learned of the issues raised.  Reckitt certified that it learned of the risk of accidental pediatric exposure on September 15, 2012 even though its own study indicated that Reckitt had learned of the risk several years earlier.  (Id. at ¶¶ 132-40.)

The FDA denied Reckitt's Citizen Petition on February 22, 2013, noting that Reckitt's announcement that it was withdrawing Suboxone tablets, "given its close alignment with the period in which generic competition for this product was expected to begin, cannot be ignored." The FDA further referred Reckitt's conduct to the Federal Trade Commission ("FTC") for antitrust investigation.  (Id. at ¶¶ 141-43.)

Plaintiffs assert that once the Citizen Petition was denied, the FDA immediately granted final approval of the ANDAs of two generic manufacturers, Amneal and Actavis, for generic Suboxone tablets.  Three weeks later, on March 18, 2013, Reckitt withdrew branded Suboxone tablets from the market, which Plaintiffs characterize "as a last ditch effort to further coerce the market to switch to the non-improved film product."  (Id. at ¶¶ 143-44.)

### 4.  Alleged Effects of Reckitt's Scheme

Plaintiffs urge that Reckitt's multifaceted scheme outlined above foreclosed or severely limited generic competition to branded Suboxone.  In addition to delaying the Generic's entry onto the market, Plaintiffs claim that by the time the generic ANDAs were approved, Reckitt had coerced physicians to largely convert to prescriptions for Suboxone film, which cannot be substituted for a generic product.  Plaintiffs assert these actions have caused an ongoing antitrust injury to the Direct Purchasers, the End Payors, and the public at large by preventing Generics from meaningfully and efficiently competing with Reckitt.  Plaintiffs conclude that these actions

were all designed to maintain monopoly profits in violation of the Sherman Act and state law. (Id. at ¶¶ 145-50, 156.)

**B.   Specific Causes of Action**

The Direct Purchasers seek damages and injunctive relief through the following claims, all of which are alleged to violate § 2 of the Sherman Act: (1) unlawful maintenance of monopoly power through an overarching scheme to prevent or delay generic competition ("Count I"); (2) unlawful maintenance of monopoly power by conversion of the market from tablet to film formulation ("Count II"); (3) unlawful maintenance of monopoly power by intentionally delaying the SSRS process and violating 21 U.S.C. § 355-1(f)(8) ("Count III"); (4) unlawful maintenance of monopoly power by filing a sham Citizen Petition ("Count IV"); and (5) unlawful maintenance of monopoly power by fraudulently delaying the filing of the Citizen Petition ("Count V").  (Id. at ¶¶ 166-200.)

The End Payors assert the following causes of action: (1) monopolization and monopolistic scheme under state law (listing 29 state statutes) ("Count I"); (2) attempted monopolization under state law (listing 29 state statutes) ("Count II"); (3) unfair and deceptive trade practices under state law (listing 28 state statutes) ("Count III"); (4) injunctive and declaratory relief under § 16 of the Clayton Act for Reckitt's violations of § 2 of the Sherman Act ("Count IV"); and (5) unjust enrichment under state law (under 48 states and the District of Columbia) ("Count V").  (EP Compl. ¶¶ 163-99.)

Reckitt has filed motions to dismiss each of the Plaintiffs' amended complaints.

**II.   STANDARD OF REVIEW**

In deciding a motion to dismiss, the court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light

most favorable to the non-moving party." DeBenedictis v. Merrill Lynch & Co., Inc., 492 F.3d 209, 215 (3d Cir. 2007) (quoting Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989)).  Reckitt raises arguments for dismissal under the pleading standards of both Federal Rule of Civil Procedure 8(a) and 9(b) in their motions.

### A.  **Pleading under Rule 8(a)**

Under Rule 8(a), in order to survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." Id.  To determine the sufficiency of a complaint under Twombly and Iqbal, a court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

### B.  **Pleading under Rule 9(b)**

Rule 9(b) provides, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  The pleadings must be specific enough to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent

behavior." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of . . . fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue." United States ex rel. Streck v. Allergan, Inc., 894 F. Supp. 2d 584, 590-91 (E.D. Pa. 2012) (quoting In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002)).

### III.   LEGAL ANALYSIS

#### A.   Overview - Reckitt's Motion to Dismiss the Direct Purchasers' Complaint

All of the Direct Purchasers' claims invoke § 2 of the Sherman Act, which states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations" is guilty of an offense and subject to penalties. 15 U.S.C. § 2.

The following are elements of a § 2 monopolization claim: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). Simple possession of monopoly power is not enough; a defendant must also engage in exclusionary conduct to run afoul of § 2. Walgreen Co. v. AstraZeneca Pharm. L.P., 534 F. Supp. 2d 146, 150 (D.D.C. 2008) (quoting Phillip E. Areeda & Herbert Hovenkamp, 3 Antitrust Law § 650a(1) at 67 (rev. ed. 1996)). "Exclusionary conduct is 'that which prevents actual or potential rivals from competing or impairs their opportunities to do so effectively.'" Id. "The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." United States v. Microsoft

Corp., 253 F.3d 34, 58 (D.C. Cir. 2001) (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993)).

The plaintiff bears the burden of demonstrating that a monopolist's conduct has the requisite anticompetitive effect, and if he is successful, the burden moves to the defendant to demonstrate a procompetitive justification for its conduct.  Id. at 58-59 (citing Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 483 (1992)).  Finally, "if the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." Id.

Reckitt raises four core arguments for dismissal of the Direct Purchasers' claims: (1) Count II, relating to the introduction of Suboxone Film, fails because the law presumes that the introduction of new and different products increases competition; (2) Count III, relating to Reckitt's alleged failure to cooperate during the REMS period, fails because the Supreme Court has unequivocally held that a monopolist has no duty to deal with its competitors; (3) Counts IV and V, relating to Reckitt's Citizen Petition, should be dismissed because the Citizen Petition was not a sham and did not delay Generic market entry; and (4) Count I, which asserts a claim for the combined effect of Reckitt's actions, fails because none of the underlying actions violate the antitrust laws, and unsuccessful claims cannot be combined to state a successful one.  Each of these arguments is addressed below.[6]

### B.  Count II – Introduction of Suboxone Film

Reckitt argues that the introduction of a new product by definition increases competition in the relevant market, and therefore cannot be found to be anticompetitive.  Reckitt further

---

[6] All of the arguments raised in Reckitt's motion to dismiss the Direct Purchasers' complaint have also been incorporated as arguments requiring dismissal of the End Payors' state law antitrust claims.  As the arguments raised and facts alleged apply equally to both groups of Plaintiffs, I will refer generally to Plaintiffs in this section where appropriate.

asserts that Plaintiffs acknowledged in their complaints that Suboxone film made improvements to the tablets which are procompetitive, not exclusionary. Finally, Reckitt argues that any harm that would arise from the introduction of a new product is inflicted upon competitors, not competition itself, and therefore is not the type of injury the antitrust laws were created to address.

### 1.   Does the "Product-Hopping" Conduct Alleged Constitute Exclusionary Conduct?

"'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." West Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 109 (3d Cir. 2010) (quoting LePage's Inc. v. 3M, 324 F.3d 141, 152 (3d Cir. 2003)). "[A]s a general rule, any firm, even a monopolist, may . . . bring its products to market whenever and however it chooses." Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 925 n.7 (3d Cir. 1999) (quoting Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 286 (2d Cir. 1979)). New and improved products are one of the benefits brought about by healthy competition. Abbott Labs. v. Teva Pharm. USA, Inc., 432 F. Supp. 2d 408, 420 (D. Del. 2006) (citing Berkey Photo, 603 F.2d at 286). Even a monopolist may expand its market share and increase demand for its products through technological innovation, "and such actions are 'perfectly consistent with the competitive forces that the Sherman Act was intended to foster.'" Id. (quoting Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 546 (9th Cir. 1983)).

Because ordinarily innovation will also inflict harm upon competitors, "courts should not condemn a product change . . . unless they are relatively confident that the conduct in question is anticompetitive." Id. at 421 (quoting Herbert Hovenkamp, Mark D. Janis & Mark A. Lemley, IP and Antitrust § 12.1). However, "when the introduction of a new product by a monopolist

prevents consumer choice, greater scrutiny is appropriate" and the "basis for judicial deference is removed." Id.  When assessing whether conduct is exclusionary, "it is not necessary that all competition be removed from the market.  The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." United States v. Dentsply Int'l, Inc., 399 F.3d 181, 191 (3d Cir. 2005) (citing LePage's, 324 F.3d at 159-60; Microsoft, 253 F.3d at 69).

In support of its argument that Plaintiffs have failed to establish exclusionary conduct under a "product hopping" theory, Reckitt relies heavily upon Walgreen Co. v. AstraZeneca Pharmaceuticals L.P., 534 F. Supp. 2d 146 (D.D.C. 2008).  In that case, AstraZeneca marketed prescription Prilosec capsules, a heartburn medication, through the expiration of its patent in October 2001.  In June 2003, the FDA approved an over-the-counter version of Prilosec and granted AstraZeneca exclusivity in that market through June 2006.  AstraZeneca also brought prescription Nexium, another heartburn medication, to the market during this time period, and that patent did not expire until 2014.  AstraZeneca very aggressively promoted and "detailed"[7] Nexium, while simultaneously ceasing to promote prescription Prilosec.  As a result of this marketing, by the time generic prescription Prilosec entered the market, the generics were only able to capture 30% of the market, which the plaintiffs alleged was much lower than they would have captured absent AstraZeneca's intervention.  AstraZeneca's conduct was alleged to be exclusionary because it used "distortion and misdirection in marketing, promoting and detailing Nexium" so as to switch the market from Prilosec, which now had generic competition, to a virtually-identical drug, Nexium, which did not.  Id. at 148-49.

_____

[7] "'Detailing' in the retail pharmaceutical business refers to the practice of sending company representatives to doctors' offices to distribute samples and promotional materials and information." Walgreen, 534 F. Supp. 2d at 149 n.4.

The court determined that AstraZeneca's actions did not violate § 2 of the Sherman Act and granted the defendants' motions to dismiss because marketing Nexium did not eliminate choices available to the consumer.  Prescription Prilosec was never removed from the market, allowing consumers to obtain prescription Prilosec, and by extension generic Prilosec, if they preferred that product.  Id. at 150-52.  The court also found that the plaintiffs had not established an injury because "[t]he fact that a new product siphoned off some of the sales from the old product and, in turn, depressed sales of the generic substitutes for the old product" does not establish an antitrust injury, as it does not interfere with the generics' freedom to compete.  Id. at 152.

Plaintiffs assert that Walgreen is factually distinguishable from the case before me, and urge that I follow the reasoning set forth in Abbott Laboratories v. Teva Pharmaceuticals USA, Inc., 432 F. Supp. 2d 408 (D. Del. 2006) ("TriCor").  In TriCor, the court found that the plaintiffs had stated a claim for a § 2 antitrust violation where the defendants, the brand-name manufacturer of TriCor, allegedly attempted to thwart generic competition through a product-hopping scheme.  The plaintiffs in TriCor claimed that the defendants had engaged in the following conduct: (1) the defendants changed the formulation of TriCor from capsules to tablets in order to prevent generic substitution; (2) after the tablet formulation was approved, the defendants stopped selling TriCor capsules; (3) the defendants bought back the existing supplies of TriCor capsules from pharmacies; and (4) the defendants changed the code for TriCor capsules in the National Drug Data File ("NDDF") to "obsolete," which prevented pharmacies from filling TriCor prescriptions with a generic capsule formulation.  Id. at 415-16.

The defendants in TriCor raised a nearly identical argument as Reckitt does here: that the introduction of a new product was procompetitive per se and that improvements had been made

16

from one formulation to another.  Id. at 420.  The court recognized that deference is ordinarily given to innovation and the creation of new products.  However, given the unique nature of the pharmaceutical drug market and the actions taken by the defendants in removing old formulations from the market and preventing consumer choice, the court determined that the plaintiffs had set forth sufficient facts to establish exclusionary conduct and survive a motion to dismiss.  Id. at 421-22.  The court reasoned that the nature of the pharmaceutical drug market warranted applying the rule of reason approach identified in United States v. Microsoft Corp., 253 F.3d 34, 58 (D.C. Cir. 2001), where the defendant's procompetitive justifications are weighed against the anticompetitive results.  Id. at 422.

The defendants in TriCor further argued that their product-hopping could not be exclusionary because, although generic TriCor capsules could not be exchanged for a brand-name TriCor prescription, the generics were not foreclosed from marketing their own TriCor formulations.  The court rejected this argument, finding that complete foreclosure from the market was not the appropriate standard.  Instead, the court determined that the generics could not

> provide generic substitutes for the current TriCor formulation, which is alleged to be their cost-efficient means of competing in the pharmaceutical drug market. That opportunity has allegedly been prevented entirely by Defendants' allegedly manipulative and unjustifiable formulation changes.  Such a restriction on competition, if proven, is sufficient to support an antitrust claim in this case.

Id. at 422.

The conduct alleged in the case before me seems to fall somewhere between that alleged in Walgreen and TriCor.[8]  Unlike the facts at issue in Walgreen, Reckitt announced that it was

---

[8] At oral argument, Reckitt also claimed that Mylan Pharmaceuticals, Inc. v. Warner Chilcott Public Ltd. Co., 2013 WL 5692880 (E.D. Pa. June 12, 2013), supported its position.  There, the district court expressed skepticism as to whether the defendants' alleged product-hopping

removing Suboxone tablets from the market several months prior to generic approval, and actually did remove the tablets from the market within a few weeks of generic entry.  Therefore, the freedom of consumer choice that the <u>Walgreen</u> court found compelling is more limited here.  However, the restriction of the market's ambit does not appear to be quite as extreme as that found in <u>TriCor</u>, as it is not alleged that Reckitt bought back existing Suboxone tablets or labeled the product "obsolete."   Thus, while <u>Walgreen</u> and <u>TriCor</u> are instructive, they are not dispositive of whether Plaintiffs have pleaded sufficient facts to survive Defendants' motion on Count II.

Although the issue of product-hopping is relatively novel, what is clear from the case law is that simply introducing a new product on the market, whether it is a superior product or not, does not, by itself, constitute exclusionary conduct.  The key question is whether the defendant combined the introduction of a new product with some other wrongful conduct, such that the comprehensive effect is likely to stymie competition, prevent consumer choice and reduce the market's ambit.  This analysis must be undertaken with the somewhat unique characteristics of the pharmaceutical market in mind.

Plaintiffs allege that the wrongful conduct included raising false safety concerns and disparaging Suboxone tablets, both of which played an important role in Reckitt's success in switching the market from tablets to film.  Reckitt counters that false disparagement of a product cannot give rise to antitrust liability under <u>Santana Products Inc. v. Bobrick Washroom Equipment, Inc.</u>, 401 F.3d 123 (3d Cir. 2005).  In <u>Santana</u>, the United States Court of Appeals for the Third Circuit found that a company's disparagement of another company's product, even

---

scheme constituted exclusionary conduct.  <u>Id.</u> at *2.  However, the court in <u>Mylan</u> did not dismiss the plaintiffs' claims, instead finding that the development of a record was necessary. <u>See</u> <u>id.</u>

if the statements were untrue, was not a restraint of trade absent "coercive" measures—that is, "measures that prevented [the plaintiff] from selling its products to any willing buyer or prevented others from dealing with [the plaintiff]." Id. at 132.  However, the Third Circuit has since remarked that, despite its prior holding in Santana, "in some cases, such defamation, which plainly is not competition on the merits, can give rise to antitrust liability, especially when it is combined with other anticompetitive acts." W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 109 n.14 (3d Cir. 2010) (citing LePage's, 324 F.3d at 153, 162).

Having carefully reviewed Plaintiffs' complaint, I find that the facts presented sufficiently allege that the disparagement of Suboxone tablets took place alongside "coercive" measures.  The threatened removal of the tablets from the market in conjunction with the alleged fabricated safety concerns could plausibly coerce patients and doctors to switch from tablet to film.  A patient that preferred the tablets despite the safety concerns might be further persuaded to switch to the film, believing that their favored product would soon be removed from the market.

Reckitt also argues that Plaintiffs' allegations of false disparagement are insufficient because the complaints do not plead fraud with sufficient specificity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure.  See Lum v. Bank of America, 361 F.3d 217, 228 (3d Cir. 2004) (recognizing that antitrust allegations involving fraud must comply with the pleading requirements of Rule 9(b)) (abrogation on other grounds recognized in In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 323 n.22 (3d Cir. 2010)).  "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of . . . fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story[—]that is, the who, what, when, where and how of the events at issue." U.S. ex rel. Streck v. Allergan, Inc., 894 F. Supp. 2d 584,

590-91 (E.D. Pa. 2012) (quoting In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002)).

Plaintiffs claim that in conjunction with the switch from tablet to film in 2010, Reckitt "implemented a massive fraudulent sales and marketing campaign to convert all or substantial [Suboxone] prescriptions from tablets to film." (DP Compl. ¶ 89.) It is also alleged that Reckitt sales representatives met with physicians to promote the film formulation while simultaneously discouraging physicians from writing prescriptions for Suboxone tablets under the guise of false safety concerns—in particular, that the lack of unit dose packaging in the tablets raised the risk of pediatric exposure. (Id. at ¶¶ 89, 95.) Further, Plaintiffs claim that Reckitt announced the removal of the tablets from the market on September 25, 2012 due to fabricated safety concerns in an attempt to switch patients from the tablet to the film. (Id. at      ¶¶ 89, 93-94.) Instead of actually removing the product at that time, Reckitt allegedly continued to sell tablets through March 2013, which Plaintiffs argue demonstrates the falsity of Reckitt's stated safety concerns. (Id. at ¶ 94.) According to Plaintiffs, Reckitt's goal in making these misrepresentations was to transfer as much of the market from tablet to film as possible prior to generic entry. (Id. at ¶ 93.) These allegations have been made with particularity in accordance with Rule 9(b), and are sufficient to "place the defendants on notice of the precise misconduct with which they are charged." See Seville, 742 F.2d at 791. Therefore, I will consider these allegations in determining whether the complaints plausibly make out an antitrust violation.

With regard to the withdrawal of Suboxone tablets from the market, Reckitt focuses on the fact that the defendants in TriCor engaged in repurchasing existing supplies held by pharmacies and changing the NDDF code to obsolete—facts which are not alleged here. Reckitt asserts that because it did not engage in this conduct, the Generics are not now, nor have they

ever been, foreclosed from selling their products, which undermines Plaintiffs' claims of exclusionary conduct.

While Reckitt did not repurchase existing supplies held by pharmacies or change the NDDF code on the tablets to obsolete, the withdrawal of Suboxone tablets is alleged to have created a similar effect of reducing consumer choice.  While Plaintiffs acknowledge that the Generics have not been completely foreclosed from the market, neither were the generics in TriCor.  As noted previously, complete foreclosure is not the standard articulated by the Third Circuit for establishing anticompetitive conduct.  Rather, "[t]he test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."  Dentsply, 399 F.3d at 191.  As recognized in TriCor, "[c]ompetitors need not be barred 'from all means of distribution,' if they are barred 'from the cost-efficient ones.'"  TriCor, 432 F. Supp. 2d at 423 (quoting Microsoft, 253 F.3d at 64).[9]

Plaintiffs have plausibly alleged that various market forces unique to the pharmaceutical industry make generic substitution the cost-efficient means of competing for companies selling generic pharmaceuticals.  For example, Plaintiffs assert that a disconnect exists between the person paying for the prescription and the person selecting the appropriate treatment.  Due to this disconnect, the ordinary market forces that would allow consumers to consider price when

---

[9] I note that Plaintiffs also alleged that Reckitt engaged in anticompetitive behavior by reducing the price of its film and raising the price of the tablets, despite the fact that the film was more expensive to manufacture.  Reckitt correctly notes that only predatory pricing—that is, price decreases by a monopolist below any reasonable measure of cost—can be anticompetitive.  Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 339 (1990) ("in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect"); see also Schor v. Abbott Labs., 457 F.3d 608, 610-11 (7th Cir. 2006).  While there are no allegations of predatory pricing here, I do not believe that this completely forecloses Plaintiffs' antitrust claims.  See ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 277 (3d Cir. 2012) (finding that, where "price itself was not the clearly predominant mechanism of exclusion," failure to establish predatory pricing did not preclude the plaintiffs' claim).

selecting a product are derailed.  The patient also cannot simply request to receive a generic from

his or her pharmacist because the film and the generic tablets are not AB-rated and thus may not

be substituted.

For all of these reasons, as it relates to their "product-hopping" allegations, I find that

Plaintiffs have plausibly pleaded exclusionary conduct, as required for an antitrust claim.

### 2.  Does the Complaint Sufficiently Plead an Injury to Competition?

Having determined that Plaintiffs have sufficiently alleged exclusionary conduct as it

relates to the "product-hopping" scheme, I now turn to whether an antitrust injury has been

properly pleaded.  Reckitt argues that Plaintiffs have failed to establish an antitrust injury on

Count II because the introduction of Suboxone film in and of itself is not alleged to have delayed

Generic entry into the marketplace.  Reckitt urges that the only injury that could have been

caused by the film's introduction stems from an increase in competition.

Lost profits attributable to increased competition is not the type of injury the antitrust

laws were designed to redress.  See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477,

488-89 (1977).   The antitrust laws "were enacted for 'the protection of competition not

competitors.'"  Id. at 488 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)).

"[W]hen an alleged antitrust conspiracy involves multiple acts, [t]he character and effect of [that]

conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by

looking at it as a whole."  Smithkline Beecham Corp. v. Apotex Corp., 383 F. Supp. 2d 686, 699,

702 (E.D. Pa. 2004) (quoting Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690,

699 (1962)) (quotation marks omitted).[10]   "[T]he existence of antitrust injury is not typically

---

[10] Although Continental Ore involved a § 1 conspiracy claim, the Third Circuit has applied its
reasoning to § 2 cases as well.   LePage's, 324 F.3d at 162 ("the courts must look to the
monopolist's conduct taken as a whole rather than considering each aspect in isolation").

resolved through motions to dismiss," although courts can and do decide these issues at the 12(b)(6) stage.  Schuylkill Energy Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405, 416-19 (3d Cir. 1997) (citing Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 876 (3d Cir. 1995)).

Plaintiffs allege that by wrongfully suppressing generic competition on the market, they were forced to pay more for Suboxone products than they otherwise would have paid.  "When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general."  LePages, 324 F.3d at 159; see also Dentsply, 399 F.3d at 191.  Although Count II of the Direct Purchasers' complaint relates to Reckitt's introduction of Suboxone film, and generally the introduction of new products does not create antitrust injury, I must still consider Plaintiffs' allegations of Reckitt's activity as a whole, which includes the withdrawal of Suboxone tablets, the alleged fraudulent marketing campaign and tactics designed to delay ANDA approval (discussed infra).  If the anticompetitive effect of this conduct is proven, and it resulted in purchasers paying inflated prices, Plaintiffs could establish harm to competition itself.  See Tunis Bros. Co. v. Ford Motor Co., 952 F.2d 715, 728 (3d Cir. 1991) ("An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services") (quotation marks omitted).  Therefore, I find that Plaintiffs have pleaded sufficient facts to establish antitrust injury.

Defendants further allege that the Direct Purchasers do not have standing because there is a more direct victim of Reckitt's conduct—the Generic manufacturers.  Section 4 of the Clayton Act, which allows treble damages for violation of the antitrust laws, states as follows: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover

threefold the damages by him sustained."  15 U.S.C. § 15.  The Direct Purchasers who are overcharged as a result of an antitrust violator's actions are generally considered to have antitrust standing.  See Illinois Brick Co. v. Illinois, 431 U.S. 720, 729 (1977) ("the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property'").  Therefore, I do not find Reckitt's standing argument convincing.

In conclusion, I find that the Direct Purchasers' claim under Count II for introduction of the Suboxone film in the context of an alleged product-hopping scheme should survive the motion to dismiss stage.

### C.   Count III – Unlawful Maintenance of Monopoly Power by Intentionally Delaying the SSRS Process and Violating 21 U.S.C. § 355-1(f)(8)

Reckitt asserts that Count III of the Direct Purchaser's complaint should be dismissed because the SSRS process, where the parties tried to work together to establish the safe use of the drug, was simply a course of dealing and the antitrust laws do not obligate Reckitt to interact with its competitors on terms they find favorable.  Reckitt garners support from a line of Supreme Court cases on the "duty to deal."

In Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004), the Supreme Court considered whether a complaint alleging that Verizon had breached its duty under the Telecommunications Act of 1996 to facilitate market entry by competitors stated a claim for violation of § 2 of the Sherman Act.  The Telecommunications Act of 1996 required Verizon, and other incumbent local telephone companies, to facilitate competitors' market entry by requiring the incumbent to share its network with competitors.  Verizon was also obligated to provide access to its operations support systems, which ensured quality of service.

Verizon was accused of intentionally failing to fill operations support orders in violation of the Act and was investigated by the FCC for its conduct.  Customers of Verizon's competitors

filed suit for antitrust violation, alleging that Verizon had engaged in an anticompetitive scheme to discourage customers from becoming or remaining customers of competing companies.  Id. at 402-04.  The Court held that "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaging in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal.'"  Id. at 408 (quoting United States v. Colgate & Co., 250 U.S. 300, 307 (1919)).  The Court concluded that the antitrust laws did not create a duty to deal in that instance, as they provided little additional benefit to the regulations already in place.  The Court noted "[w]here such a [regulatory] structure exists, the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny."  Id. at 411-12.

The Supreme Court reaffirmed these principles in Pacific Bell Telephone Co. v. Linkline Communications, Inc., 555 U.S. 438 (2009).  There, the FCC required AT&T to sell transmission service to independent DSL providers for the purposes of increasing competition. Although it made its service available, AT&T was accused of "price squeezing" its competitors—that is, providing access to its DSL framework to competitors on the wholesale market at a high price, but selling its DSL services to customers on the retail market at a low price.  The plaintiffs alleged that AT&T's competitors were driven out of the market because the high wholesale costs prevented them from matching AT&T's low retail prices.  Linkline, 555 U.S. at 442-43.  The Court, relying on Trinko, held that the high wholesale prices to competitors did not violate the antitrust laws in the absence of a "duty to deal."  The Court further reasoned that the plaintiffs could not establish an antitrust injury based on AT&T charging customers at

25

low rates unless the plaintiffs demonstrated predatory pricing—that is, pricing below costs where there is a dangerous probability that the losses can be recouped.  Id. at 450-51.

Trinko and Linkline instruct that the antitrust laws do not create a duty for competitors to work together.  Statutes and regulations requiring cooperation between rivals do not alter this analysis; in fact, regulation indicates that antitrust scrutiny is not necessary or prudent.  The Court noted that although the right for a monopolist to refuse to deal with its competitors is not unqualified, it has "been very cautious in recognizing such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." Trinko, 540 U.S. at 408.

The main exception to the line of cases holding that competitors do not have a duty to deal is Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985).  There, the Court considered a course of dealing between two companies that owned ski resorts in Aspen. Beginning in 1962, the companies worked together to sell skiers an interchangeable ticket that could be used on any of the four mountains in Aspen.  Id. at 587-89.  For over fifteen years, Aspen Skiing Co. and Aspen Highlands coordinated to issue passes that covered both companies' mountains and divided the profits according to the percentage of skiers that visited a particular mountain.  Id. at 591.  However, in 1978, Aspen Skiing Co. decided to discontinue the 4-area ticket unless Aspen Highlands would accept a 12.5% fixed percentage of the revenue, which was lower than the actual usage of its mountain.  When Highlands refused, Aspen Skiing Co. began selling a pass covering only its three mountains.  When Highlands attempted to purchase Aspen Skiing's lift tickets to create a multi-pass on its own, Aspen Skiing refused, even at retail price.  Id. at 592-94. Highlands brought an antitrust claim under § 2, arguing that Aspen Skiing had monopolized the market for downhill skiing in Aspen.

26

The Court ultimately held that the right to refuse to deal was not unqualified, and that a reasonable jury could find that Aspen Skiing's conduct was exclusionary.  In reaching this conclusion, the Court significantly relied upon the prior cooperation between the two competitors that spanned many years.  The Court noted that there was significant consumer demand for the four-mountain pass and many consumers felt that they could not go to the mountain of their choice once that pass had been eliminated.  The Court determined that by prohibiting Highlands' use of its lift tickets, even at market price, Aspen Skiing's sole motivation was to harm Highlands.  Id. at 601, 605-09.

Here, throughout the SSRS process, the FDA directed the parties to work together in good faith to develop a REMS program that would ultimately lead to ANDA approval for the Generics.  The parties engaged in negotiations, and Reckitt is alleged to have taken unreasonable positions and utilized delay tactics to keep Generics off of the market for as long as possible. This SSRS process, in which competitors were required to work together, should be analyzed in light of the precedent outlined above.

Plaintiffs rely heavily upon 21 U.S.C. § 355-1(f)(8), which requires the parties to work together in good faith and not use the SSRS process to block or delay ANDA approval.[11]

---

[11] Reckitt argues that even if 21 U.S.C. § 355-1(f)(8) created a duty to deal, it does not even apply under these circumstances. 21 U.S.C. § 355-1(f)(8) states:

> No holder of an approved covered application shall use any element to assure safe use required by the Secretary under this subsection to block or delay approval of an application under section 355(b)(2) or (j) of this title or to prevent application of such element under subsection (i)(1)(B) to a drug that is the subject of an abbreviated new drug application.

Reckitt asserts that the complaints include no facts to indicate that the elements to assure safe use in Reckitt's REMS were used, or even could be used, to block or delay any ANDA.  Instead, they frame Plaintiffs' argument as disliking the terms by which Reckitt sought to negotiate. Plaintiffs respond by pointing to sections of its complaint alleging that § 355-1(f)(8) applies, and

However, <u>Linkline</u> and <u>Trinko</u> undermine Plaintiffs' position, as the Supreme Court has unequivocally stated that statutes and regulations requiring cooperation between competitors do not create an antitrust duty to deal.   In fact, these cases found that the regulatory structure requiring cooperation actually diminishes the need for antitrust scrutiny.  <u>Aspen Skiing</u>, the only Supreme Court case recognizing a failure to deal as anticompetitive, does not apply here because there is no long-standing, preexisting course of dealing between Reckitt and the Generics.[12]

Finally, Plaintiffs note that the only two cases from this circuit alleging antitrust violations for failure to provide information during the REMS process survived the motion to dismiss stage.  <u>See</u> <u>Lannett Co., Inc. v. Celgene Corp.</u>, Dkt. No. 08-cv-3920, Doc. No. 42 (E.D. Pa. Mar. 30, 2011) (Savage, J.) (denying motion to dismiss without comment); <u>Actelion Pharm. Ltd. v. Apotex Inc.</u>, 12-cv-5743, Doc. No. 90 (D.N.J. Oct 21, 2013) (Hillman, J.) (denying motion for judgment on the pleadings "for reasons stated during oral argument").  While this is true, <u>Lannett</u> and <u>Actelion</u> are distinguishable because the elements to assure safe use in those cases prevented the generics from obtaining the brand-name pharmaceutical to conduct bioequivalency testing during the REMS process.  Therefore, the generics were allegedly unable to file an ANDA as a result of the defendants' actions.  Here, the Generics were able to obtain

---

a letter written to the FDA, which recounts that the FDA previously warned Reckitt that attempts to block or delay would violate § 355-1(f)(8).  Plaintiffs argue that the FDA's interpretation of the FDCA is entitled to deference.  However, there is no document attached to the complaint that actually includes a statement from the FDA on this issue.  Therefore, I agree with Defendants that it is dubious whether Plaintiffs have sufficiently pleaded that the statute even applied.  Nevertheless, I need not decide this issue because, even assuming the statute applies, Count III will still be dismissed.

[12] Plaintiffs' reliance on <u>Safeway Inc. v. Abbott Laboratories</u>, 761 F. Supp. 2d 874 (N.D. Cal. 2011) is misplaced.  In <u>Safeway</u>, the court found that there had been a prior course of dealing between the manufacturer and its competitors, that there was evidence that it was only willing to negotiate on unreasonable terms, and there was evidence that the manufacturer refused to provide its competitors the same terms that it provided to its retail customers.  <u>Id.</u> at 892-95.  Plaintiffs here have only alleged that Reckitt refused to negotiate reasonably.  There is no history of collaboration prior to the SSRS process.  Therefore, <u>Safeway</u> is distinguishable.

Suboxone and conduct bioequivalency testing, as their ANDAs were pending before the SSRS process even began. The Generics were also capable of submitting an SSRS without Reckitt's involvement, and ultimately did just that. It would have been easier to have Reckitt provide its REMS to its competitors with no strings attached, and participation on Reckitt's part would have allowed the process to move more quickly. However, a monopolist "certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous." Linkline, 555 U.S. at 450.

The antitrust laws do not impose a duty on Reckitt to aid the Generics in obtaining expeditious approval of an ANDA. While other courts have indicated that antitrust liability may attach where the SSRS process is manipulated to completely preclude a generic from filing an ANDA, that is not the situation presently before me. To the extent that § 355-1(f)(8) prohibits name-brand drug manufacturers from manipulating the process to cause delay, this statute provides for increased FDA oversight and diminishes the need for antitrust scrutiny. Accordingly, I will grant Reckitt's motion as to Count III of the Direct Purchasers' complaint.

### D.   Counts IV & V – Unlawful Maintenance of Monopoly Power by Filing a Sham Citizen Petition and Unlawful Maintenance of Monopoly Power by Fraudulently Delaying the Filing of the Citizen Petition

Reckitt next argues that Counts IV and V of the Direct Purchasers' complaint must be dismissed for two reasons: (1) Plaintiffs have failed to adequately plead that the Citizen Petition was a sham, such that it would be subject to antitrust scrutiny; and (2) even if the Citizen Petition was a sham, a statute forbid the FDA from delaying ANDA approval while the Petition was decided, and therefore, no injury could have resulted. I address these arguments in turn.

### 1.  Have Plaintiffs Plausibly Pleaded that the Citizen Petition was a Sham?

"Those who petition government for redress are generally immune from antitrust liability." Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56 (1993).  However, immunity is not extended to "sham" activities—that is, activity (1) that is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; and (2) which "conceals 'an attempt to interfere directly with the business relationships of a competitor,' through the 'use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.'" Id. at 60-61 (quoting E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144 (1961); City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 380 (1991)) (emphasis in original).

21 U.S.C. § 355(q)(1)(E) provides that "[i]f the Secretary determines that a [Citizen] [P]etition . . . was submitted with the primary purpose of delaying the approval of an application and the petition does not on its face raise valid scientific or regulatory issues, the Secretary may deny the petition at any point based on such determination."  When Reckitt's Citizen Petition was initially submitted, several Generics requested that the FDA deny it as frivolous and intended for delay under this Section, but the FDA declined to do so.  (DP Compl., Exs. E, G.)

Reckitt urges that I find as a matter of law that the Citizen Petition was not a sham based upon the Petition itself and the FDA's response thereto.  Whether petitioning activity is a sham is generally a question for the jury.  In re Flonase Antitrust Litig., 795 F. Supp. 2d 300, 310 (E.D. Pa. 2011).  However, "a court may decide probable cause as a matter of law" where "there is no dispute over the predicate facts of the underlying . . . proceeding." Prof'l Real Estate Investors, Inc., 508 U.S. at 63.  Reckitt argues that the Petition was not a sham because (1) the FDA took the full 150-day period for review and denied requests to summarily deny the petition; (2) the

30

FDA granted partial relief on Reckitt's requests; (3) a reasonable litigant would not have known that the FDA would require Reckitt to provide stringent proof of causation; and (4) the regulations that prohibited the FDA from granting Reckitt's requested relief were being considered for amendment at the time the Petition was filed.  Plaintiffs respond that questions of fact preclude the Court from determining whether the Petition was objectively baseless at this early stage.

While the FDA did not dismiss Reckitt's Citizen Petition outright as baseless and having been submitted purely for the purpose of delay, § 355(q)(1)(E) does not require such an action. It states that the FDA may deny a petition at any point based on a finding of frivolousness, but it does not require summary denial.  Thus, I cannot assume that the Petition must have merit simply because the FDA did not exercise its right to dismiss it outright.  Moreover, upon denying the Citizen Petition, the FDA referred Reckitt to the FTC, and noted that the timing of Reckitt's activities with announcing the withdrawal of Suboxone tablets and the filing of the Citizen Petition "given its close alignment with the period in which generic competition for [that] product was expected to begin, cannot be ignored."  (DP Compl., Ex. G, pp. 15-16.)

The FDA acknowledged in its ruling that it had no authority to grant much of Reckitt's requested relief.  (See supra p. 8.)  The FDA cannot require ANDA filers to mimic non-approved labeling and REMS materials in order to obtain approval, due to 21 U.S.C. § 355(j)(4)(G) and 21 C.F.R. § 314.127(a)(7).  (See DP Compl., Ex. G., p. 12 ("The FD&C Act requires that labeling for an ANDA be the same as the labeling 'approved for the listed drug'").)[13]  Additionally, despite Reckitt's request that the FDA investigate why Suboxone tablets had been withdrawn

---

[13] While the FDA did state that it "welcomes and encourages sponsors to utilize unit-dose packaging," it also stated "we do not believe the data at this time support refusing to approve applications that lack such packaging."  (DP Compl., Ex. G., p. 14.)  Reckitt tries to argue that based on this "encouragement" some of its relief was granted.  I disagree with that assertion.

from the market, Reckitt was continuing to sell the product at that time.  (Id. at pp. 14-15.) Finally, the FDA determined that Reckitt did not provide evidence that the measures it sought to impose caused any decline in accidental pediatric exposures.  Indeed, the study Reckitt submitted in support of its Petition "acknowledged that the impact of education interventions and packaging on the decline in pediatric exposure was not evaluated, and that definitive conclusions about these measures could not be reached."  (Id. at p. 9.)

In short, the FDA denied all of Reckitt's requested relief.  Much of the relief sought was not even available to the FDA to grant, and Reckitt sought an investigation of its own reasons for withdrawing Suboxone tablets at a time when the tablets remained on the market.  As such, Plaintiffs have plausibly pleaded that the Petition was objectively baseless in that no reasonable litigant could have realistically expected success on the merits.  I also find that Plaintiffs have adequately alleged that Reckitt had the subjective intent to interfere with the business of a competitor through the use of the petitioning process.

### 2. Have Plaintiffs Established an Antitrust Injury Regarding the Citizen Petition?

I next consider Reckitt's argument that the filing of a Citizen Petition did not cause antitrust injury.  21 U.S.C. § 355(q)(1)(A) states that the Secretary shall not delay approval of an NDA or ANDA because of a Citizen Petition unless "the Secretary determines, upon reviewing the petition, that a delay is necessary to protect the public health" and that "[c]onsideration of the petition shall be separate and apart from review and approval of any application."

Plaintiffs have alleged that despite this statutory framework, delays still occur and did occur in this instance.  Reckitt responds that Plaintiffs' failure to articulate that the FDA violated 21 U.S.C. § 355(q)(1)(A) in the complaints is fatal to their claim.  Reckitt also presents documents subject to judicial notice showing that the FDA approved the Generics' ANDAs ten

days after the last amendment was submitted, indicating that the amendments were the reason for any delays in ANDA approval, not the Citizen Petition.  Finally, Reckitt presents an FDA ruling on a citizen petition filed by Novartis Pharmaceuticals Corporation, where the FDA noted that the petition lacked merit and had been responsible for a 25-day delay in the approval of ANDAs. (Reckitt Mot. to Dismiss DP Compl., Ex. D, p. 12 ("We note that the 25-day delay in approval of the ANDAs was entirely the result of the timing of Novartis's Petition, rather than its merits").) Reckitt argues that the lack of any such comment in the FDA's ruling here demonstrates that it did not cause a delay.

I find that the complaints plausibly allege that the Citizen Petition caused antitrust injury by delaying Generic entry into the market.  The complaints state that Reckitt filed the Citizen Petition for the purpose of delaying Generic competition, and but for the filing of the Citizen Petition, "competitors would have begun marketing generic version of Suboxone well before they actually did."  (DP Compl. ¶¶ 189-90.)  They further allege that, despite the enactment of § 355(q)(1)(A), "a branded firm may still be able to delay generic approval while the FDA considers whether the relevant Citizen Petition implicates issues of public health, regardless of whether the petition actually does or not, and regardless of whether the petition is [a] sham or not."  (Id. at ¶ 72.)  The combination of these two allegations indicates that the FDA violated 21 U.S.C. § 355(q)(1)(A).  To dismiss a claim for not using that exact language would be to place form over substance.

Furthermore, I find that the Novartis petition presented by Reckitt actually supports Plaintiffs' argument.  The FDA clearly stated in its ruling that delays still occur despite the mandate of 28 U.S.C. § 355(q)(1)(A).  As to Reckitt's argument that any delays in approval of

the ANDA were due to amendments made by the Generics themselves, this is a classic factual issue that is properly determined by a fact finder.

For the reasons stated above, I conclude that Plaintiffs have sufficiently pleaded an antitrust injury, and accordingly, Reckitt's motion to dismiss Counts IV and V of the Direct Purchasers' complaint is denied.

### E.   Count I – Unlawful Maintenance of Monopoly Power Through an Overarching Scheme to Prevent or Delay Generic Competition

Reckitt argues that Plaintiffs cannot combine multiple unsuccessful claims to state one overarching successful claim. However, as I find that three out of the four claims discussed above will survive the motion to dismiss, I need not address this argument. Reckitt's motion will thus be denied as to Count I of the Direct Purchasers' complaint.

### F.   Overview – The End Payors' Complaint and Reckitt's Motion to Dismiss

The facts alleged in the End Payors' complaint are largely indistinguishable from those found in the Direct Purchasers' complaint. However, in contrast to the Direct Purchasers, the End Payors raise the following claims: (1) monopolization and monopolistic scheme under state law (listing 29 jurisdictions) ("Count I"); (2) attempted monopolization under state law (listing 29 jurisdictions) ("Count II"); (3) unfair and deceptive trade practices under state law (listing 28 jurisdictions) ("Count III"); (4) injunctive and declaratory relief under § 16 of the Clayton Act for Reckitt's violations of § 2 of the Sherman Act ("Count IV"); and (5) unjust enrichment under state law (listing 49 jurisdictions) ("Count V").

In addition to attacking each of the claims brought by the End Payors for failure to state a claim, Reckitt also argues that numerous state law claims should be dismissed for lack of Article III standing as well as antitrust standing and conflict of laws. I will address these arguments in turn.

### G.  Do the End Payors Have Article III Standing?

Constitutional standing under Article III requires the following elements: (1) "an injury-in-fact that is concrete and particularized and actual or imminent, as opposed to conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Edmonson v. Lincoln Nat. Life Ins. Co., 725 F.3d 406, 414-15 (3d Cir. 2013) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992)).  In addition to these immutable requirements of Article III, "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Miller v. Nissan Motor Acceptance Corp., 362 F.3d 209, 221 (3d Cir. 2004) (quoting Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 485 (3d Cir. 1998)).

"That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Lewis v. Casey, 518 U.S. 343, 357 (1996) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 n.20 (1976)).  "[E]ach claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." Griffin v. Dugger, 823 F.2d 1476, 1483 (11th Cir. 1987).

Although the End Payors have brought claims under the laws of forty-eight states and two territories, they reside in only seven of these states: Alabama, Illinois, Massachusetts, Michigan, Minnesota, New York and Pennsylvania. (EP Compl. ¶¶ 102-10.)  These End Payors allege that they made purchases or reimbursed customers for Suboxone in only ten additional

states: Alaska, California, Florida, Iowa, Kentucky, Mississippi, Missouri, New Jersey, Nevada and Wisconsin.[14]   (Id.)   The complaint also notes that Reckitt is located in Virginia, and is alleged to have engaged in many of the actions leading to these claims in that state.   (Id. at ¶ 112-14.)

Reckitt argues that the named End Payor Plaintiffs have not been injured, and thus lack standing to assert claims, in the remaining thirty-two states and territories.[15]   The End Payors do not dispute that the nine named End Payor Plaintiffs do not reside in and did not suffer a financial injury in those thirty-two states.   They urge, however, that the initial inquiry should be whether they have standing to bring any state antitrust, consumer protection, or unjust enrichment claim.   Then, once general standing is established, the End Payors argue that they should be allowed to pursue the claims of absent class members who may have suffered an injury in other states.   According to the End Payors, the question of whether they prosecute claims brought on behalf of class members under the law of other states should be decided as a class certification issue under Federal Rule of Civil Procedure 23, not as a matter of Article III standing.

Reckitt relies heavily upon In re Wellbutrin XL Antitrust Litigation, 260 F.R.D. 143 (E.D. Pa. 2009), where the Honorable Mary A. McLaughlin answered the exact question at issue here—"whether the Court should consider the named plaintiffs' standing to bring the claims

---

[14] The End Payors' customers are also alleged to have made purchases in Ohio.  However, this is irrelevant for the purposes of my analysis because no claims have been brought under Ohio law.

[15] While Reckitt asserts that the End Payors' claims under Virginia law should be dismissed for lack of standing, it later argues that under conflict of laws principles the End Payors "can only assert claims under the laws of Virginia or their residence" and advocates applying Virginia law. (Reckitt Mot. to Dismiss EP Compl., pp. 8, 10.)  I find that the End Payors' allegations that Reckitt engaged in wrongful, anticompetitive conduct in Virginia is sufficient to establish standing in that state.

asserted under each individual state's law or should wait until the class certification stage to make such an assessment." Id. at 151.  Judge McLaughlin determined that standing was a threshold inquiry that must be addressed prior to class certification,[16] reasoning that the alternative:

> . . . would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union.  At the conclusion of that discovery, the plaintiffs would apply for class certification, proposing to represent the claims of parties whose injuries and modes of redress they would not share.  That would present the precise problem that the limitations of standing seek to avoid.

Id. at 155.  Judge McLaughlin ultimately concluded that the plaintiffs, end payor health and welfare funds, had standing to bring claims under the laws of the states where the plaintiffs themselves were located and states where the plaintiffs' members had purchased Wellbutrin.  Id. at 156-57.  However, all other state law claims were dismissed for lack of standing.  Id. at 158.  I agree with Judge McLaughlin's reasoning.

The End Payors attempt to distinguish Wellbutrin, arguing that the question is not one of standing but instead a question of representativeness under Rule 23, and therefore a ruling on this issue is premature.  The End Payors rely upon In re Nexium (Esomeprazole) Antitrust Litigation,

---

[16] Wellbutrin reflected on two Supreme Court cases, Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997) and Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999), in which the Supreme Court considered the propriety of class certification immediately prior to assessing Article III standing.  However, Wellbutrin found these cases to be distinguishable.  In Amchem and Ortiz the Supreme Court had been asked to determine the standing of potential class members as opposed to the standing of the named plaintiffs.  Further, in Amchem and Ortiz, a finding that class certification was improper would have negated any need to determine standing, making class certification "logically antecedent" to the Article III issue.  Wellbutrin, 260 F.R.D. at 153-54.  Indeed, "[t]o rule on the issue of standing at that point in the case would have required the Court to make a determination as to the standing of persons who were not actually parties to the case, but who were only proposed parties to the case."  Id. at 153.  Therefore, for these additional reasons, I agree with the analysis in Wellbutrin finding that Amchem and Ortiz are distinguishable, and that class certification is not logically antecedent to standing in this case.

968 F. Supp. 2d 367 (D. Mass. 2013), where the court determined that once the named plaintiffs had established that they had suffered an injury due to overpayments from the lack of generic competition, the standing inquiry ended.  The court determined that after that point, whether the named plaintiffs could raise the claims of the class it purports to represent should be determined under Rule 23 at the class certification stage.  <u>Id.</u> at 404-05; <u>see also</u> <u>In re Chocolate Confectionary Antitrust Litig.</u>, 602 F. Supp. 2d 538, 579-80 (M.D. Pa. 2009).[17]

The majority of the other cases cited by the End Payors generally involve situations where a named plaintiff has suffered an injury that established standing to sue under a particular law—for example, Title VII—and the court considered whether the named plaintiffs' claims were sufficiently similar to the claims of potential class members under the same law.  <u>See</u> <u>Goodman v. Lukens Steel Co.</u>, 777 F.2d 113, 122 (3d Cir. 1985); <u>see also</u> <u>Gratz v. Bollinger</u>, 539 U.S. 244, 265 (2003) (claims of named plaintiff and potential class brought under the equal protection clause).  The named plaintiffs in those cases clearly suffered an injury that could be redressed by the statute or constitutional amendment invoked in the complaint.  That is not the case here, where none of the named End Payor Plaintiffs have suffered an injury that may be redressed by the law of thirty-two of the fifty jurisdictions cited.

The fact that this is a class action should not change the analysis "for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong

---

[17] The End Payors also cite to this Court's decision in <u>King Drug Co. of Florence, Inc. v. Cephalon, Inc.</u>, 702 F. Supp. 2d 514 (E.D. Pa. 2010), arguing that I previously rejected the reasoning of <u>Wellbutrin</u>.  However, in <u>Cephalon</u>, I did not need to reach the question at issue here—whether the named end payor plaintiffs had standing to assert state law claims on behalf of absent class members.  The named end payor plaintiffs in Cephalon had reimbursed customers, and thus had standing, in every jurisdiction in which they had brought a claim.  <u>Id.</u>  at 538.

and which they purport to represent." <u>Lewis</u>, 518 U.S. at 357 (quoting <u>Simon</u>, 426 U.S. at 40 n.20).  Since "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim," <u>Griffin</u>, 823 F.2d at 1483, the claims brought under the laws of these thirty-two different states and territories will be dismissed for lack of Article III standing.[18]

### H.   Do Conflict of Laws Principles Require Additional State Law Claims to Be Dismissed?

Reckitt further argues that while conflict of laws principles allow the End Payor Plaintiffs to assert claims under the laws of Virginia (Reckitt's "home state") or the seven "home states" of the named End Payors, claims cannot be raised under the law of states where Suboxone was purchased ("purchase states").   Reckitt acknowledges that the law within this circuit and elsewhere is in considerable disarray.   However, it urges that classic choice of laws considerations—i.e. the location of the injury, the conduct causing the injury, the domicile of the parties, and the center of the relationship between the parties—would require applying the "home

---

[18] Accordingly, the antitrust claims brought under the laws of the following states and territories are dismissed: Arizona, District of Columbia, Kansas, Maine, Nebraska, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont and West Virginia.  The End Payors have also voluntarily withdrawn their antitrust claims under Illinois, Missouri and New York law.  (<u>See</u> EP Resp., p. 34 n.29.)

The consumer protection claims under the laws of the following states and territories are also dismissed: Arkansas, Arizona, District of Columbia, Idaho, Kansas, Maine, Nebraska, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont and West Virginia.

Finally, the unjust enrichment claims brought under the laws of the following states and territories are dismissed: Arkansas, Arizona, Colorado, Connecticut, Delaware, District of Columbia, Georgia, Hawaii, Idaho, Kansas, Louisiana, Maryland, Maine, Montana, Nebraska, New Hampshire, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia and Wyoming.

state approach." This approach allows plaintiffs to bring state law claims where the plaintiffs and/or the defendants reside.

The End Payors respond that both the state where the overcharge was incurred and the state where the End Payors reside have an interest in compensating the victims of the overcharges. They point to case law where an international plaintiff was permitted to sue under the Sherman Act when the overcharge was incurred within the United States. See United States v. Aluminum Co. of Am., 148 F.2d 416, 443 (2d Cir. 1945) ("it is settled law . . . that any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends"). Therefore, they stress that where the overcharge is incurred is dispositive.

A number of cases within this district have determined that end payor plaintiffs have standing and are able to state a claim under the laws of states in which they reside, as well as the states where they have reimbursed consumers. Cephalon, 702 F. Supp. 2d at 538 (end payors' "injuries would be redressed by a favorable determination under the laws of the states where their members purchased Provigil"); Wellbutrin XL, 260 F.R.D. at 156-57 ("plaintiffs' claims have clear connection to the states where plaintiffs themselves are located and the states where their members made purchases of Wellbutrin XL"). While most cases have considered whether plaintiffs have standing to assert claims in home states or purchase states, and have not framed it as a conflict of laws analysis, some courts have made statements that can provide guidance. For example, in Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, 263 F.R.D. 205 (E.D. Pa. 2009), the court commented:

> Given the fact that the alleged injury occurred in each of the fifty states, and given each state's strong interest in protecting its own consumers (but a far weaker interest in protecting consumers from other states), it is clear . . . that the law of a particular state will govern any overcharge injury arising in that state.

40

Id. at 211 n.12; see also In re Relafen Antitrust Litig., 221 F.R.D. 260, 277 (D. Mass. 2004) ("the Court considers the more significant contact in this context to be the location of the injury—that is, the location of the sales to the end payor plaintiffs").

The Restatement (2d) of Conflicts of Laws advises that courts should consider "the basic policies underlying the particular field of law."  State laws that allow indirect purchasers to assert antitrust claims aim to protect consumers within its borders.  See In re Relafen, 221 F.R.D. at 277 ("the primary aim of antitrust and consumer protection laws generally—and those of indirect purchaser states particularly—is compensating consumers").  Each overpayment made by a consumer, or reimbursed by a Health and Welfare Plan, is a discrete injury that the state antitrust laws were designed to redress.  Therefore, I find that the End Payors may assert claims under the laws of both home states and purchase states.[19]

## I.   **Have the End Payors Stated a Claim Under State Antitrust Law?**[20]

Reckitt adopts the arguments raised in their motion to dismiss the Direct Purchasers' complaint and asserts that such arguments apply to the End Payors' state antitrust claims.  For the reasons explained above, I will not dismiss the End Payors' antitrust claims on those

---

[19]  The End Payors have identified the following states as either "home states" or "purchase states": Alabama, Alaska, California, Florida, Illinois, Iowa, Kentucky, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Pennsylvania and Wisconsin.  (EP Compl. ¶¶ 102-15.)  Claims under Virginia law may also proceed as Virginia is Reckitt's home state—the state where much of Reckitt's anticompetitive conduct is alleged to have been carried out.

[20]  Reckitt argues that the End Payors' claims for monopolization under Florida and Massachusetts law must be dismissed because these states do not permit antitrust claims by indirect purchasers.  In the same vein, Reckitt argues that California antitrust law does not recognize a claim for monopolization.  A review of the statutes cited in the End Payors' complaint demonstrates that the monopolization and attempted monopolization claims brought in Counts I and II have been brought under the Consumer Protection Laws of Florida, Massachusetts and California.  Therefore, I will address whether the End Payors have stated a claim under these statutes in the Consumer Protection Law section infra.

grounds.  However, Reckitt also raises arguments specific to the state law claims.  I address these below in the order in which they were raised.

### 1.  Antitrust Standing

Reckitt argues that the End Payors have failed to establish antitrust standing—a separate analysis from Article III standing—under the standards articulated in <u>Associated General Contractors of California, Inc. v. California State Council of Carpenters</u> ("<u>AGC</u>"), 459 U.S. 519 (1983).  In <u>AGC</u>, the Supreme Court limited federal antitrust standing, recognizing that "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property."  <u>Id.</u> at 535 (quoting <u>Blue Shield of Va. v. McCready</u>, 457 U.S. 465, 477 (1982)).  The <u>AGC</u> factors for antitrust standing are as follows: (1) the nature of the plaintiff's alleged injury, including the status of the plaintiff as a consumer or competitor in the relevant market; (2) the directness of the claimed injury; (3) whether there is a more direct victim; (4) the complexity of apportioning damages; and (5) risks of duplicative recovery.  <u>Id.</u> at 538-45.  Reckitt asserts that most of the states under which the End Payors have brought suit have adopted the <u>AGC</u> factors for application to its state antitrust laws either by express judicial decisions or by the incorporation of federal decisions interpreting federal antitrust laws.[21]

---

[21] Reckitt attaches exhibits to its motion that identify cases and statutes from each of the relevant state jurisdictions in support of all of Reckitt's state-specific arguments.  The End Payors argue that this appendix is improper for exceeding previously ordered page limits.  This argument was the subject of a motion to strike, wherein the End Payors argued that Reckitt had nearly doubled its page limit by attaching exhibits filled with authority and legal argument.  (Doc. No. 61.) Reckitt responded that the tables were for the convenience of the Court and are routinely utilized in this type of litigation where numerous state statutes are at issue.  Reckitt points out that it had previously consented to an increase in the page limit of the End Payors' response in order to allow them to more fully address these state-by-state arguments.  (Doc. No. 62.)  The motion to strike was denied, although I noted that "[s]hould the Court conclude that the numerous exhibits

AGC followed the Supreme Court's decision in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), where the Supreme Court determined, based on principles of prudential standing, that the federal antitrust statutes do not permit indirect purchasers to sue for damages.  To allow such suits, the Supreme Court feared, would create the risk of multiple liability for defendants, hopelessly complex damages calculations, and increases in the cost of antitrust litigation.  Id. at 730-32, 737-44.  Following Illinois Brick, the Supreme Court further limited the class of persons who could sue under the federal antitrust laws by laying out the antitrust standing factors identified above in AGC.  The majority of the state antitrust laws under which the End Payors have brought their claims have passed Illinois Brick repealer statutes, which allow indirect purchasers to bring antitrust claims for damages under state law.

Upon review of the precedent cited by the parties, it appears that some states have explicitly adopted the AGC factors and some have not.  Compare Lorix v. Crompton Corp., 736 N.W.2d 619, 627-29 (Minn. 2007) (explicitly rejecting application of the AGC factors to Minnesota's antitrust law) with Southard v. Visa U.S.A. Inc., 734 N.W.2d 192, 198-99 (Iowa 2007) (adopting the AGC factors in analyzing Iowa antitrust law and finding lack of antitrust standing due to remoteness of injury).  The majority of the states, however, are unclear on this issue.  Despite these inconsistencies, I need not go through the process of identifying which

---

filed by Defendant along with its Rule 12 motions are improper, those exhibits will not be considered." (Doc. No. 66.)

While these tables of authority do contain legal argument and thus exceed the previously-ordered page limit, the additional pages were likely necessary to address claims raised by the End Payors from nearly every state in the country.  As the End Payors were provided an additional twenty pages to respond to Reckitt's motion, which allowed them to identify authority from all of the relevant jurisdictions, there has been no prejudice to the End Payors.  Therefore, I will consider Reckitt's exhibits.

states have adopted the AGC factors and which have not because, in any event, I find that the End Payors have satisfied the standards for antitrust standing.

Regarding the first factor—the nature of plaintiff's alleged injury, including the status of the plaintiff as a consumer or competitor in the relevant market—Reckitt argues that none of the End Payor Plaintiffs clearly pleads that it is a purchaser of Suboxone, and therefore is neither a purchaser, nor a competitor of Reckitt. However, the complaint clearly states that the End Payors "purchased and/or provided reimbursement" to its members for Suboxone. Other courts have found that reimbursement and/or purchases of the product by a Health and Welfare Fund can satisfy the first factor. See In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 543 (D.N.J. 2004).

The End Payors argue that the second factor, directness of the injury, has minimal weight when analyzed under state law, where the state allows claims by indirect purchasers. While this is a valid point, I must note that antitrust standing is not unlimited, even in states that allow suits by indirect purchasers. For example, in Owens Corning v. R.J. Reynolds Tobacco Co., 868 So. 2d 331 (Miss. 2004), the plaintiff, a former producer of asbestos materials, brought antitrust claims against several tobacco companies, seeking to recoup money paid in judgments to persons suffering from lung disease stemming from the use of both asbestos and tobacco products. Id. at 334-36. The Mississippi Supreme Court affirmed the grant of summary judgment on claims brought under Mississippi's antitrust law, holding that the injury was too attenuated. Id. at 344.

Another example of these limitations can be found in what the parties have referred to as the "Visa" cases. In these cases, Visa and Mastercard were alleged to have forced stores that accepted their credit cards to also accept Visa and Mastercard debit cards through an illegal tying scheme. The debit card transactions resulted in inflated fees being charged to the stores. The

44

stores then proceeded to raise the prices of their products, even for customers who purchased items with cash or check. The plaintiffs were the consumers who had paid inflated prices at the store. Antitrust claims in these cases were often dismissed for remoteness of injury, as the consumers had not directly engaged in any business with, nor were they competitors of, Visa and Mastercard. See, e.g., Southard, 734 N.W.2d at 198-99; Stark v. Visa U.S.A. Inc., 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23, 2004).

While these cases make clear that directness of injury must be considered in states with Illinois-Brick repealer statutes, I find that the factor must either carry significantly less weight or directness must be analyzed more generously than under federal law. It would be inconsistent for a state to allow indirect purchasers to bring antitrust claims, only for the courts to cursorily dismiss those claims on antitrust standing grounds simply because they have been brought by indirect purchasers. See Lorix, 736 N.W.2d at 629 (remarking that it appears inconsistent to repudiate Illinois Brick and invite indirect purchaser suits "only for courts to dismiss those suits on the pleadings based on the very concerns that motivated Illinois Brick").

The End Payors also point out that they have purchased the product and/or provided reimbursement to their members who have purchased the product. This is not the situation in the Visa cases or Owens Corning where there are numerous links in the causal chain. The End Payors claim that they were overcharged when purchasing Suboxone due to the manufacturer's monopolization. These allegations are sufficiently direct to satisfy the second factor in states that allow indirect purchasers to bring antitrust claims.

For the reasons just discussed, the third factor—whether there is a more direct victim— must also carry little weight in states that allow suits to be brought by indirect purchasers. "[S]trict application of this factor, in the context of indirect purchasers, would always caution

against standing, an outcome incompatible with the purpose of <u>Illinois Brick</u> repealer statutes." <u>D.R. Ward Constr. Co. v. Rohm & Haas Co.</u>, 470 F. Supp. 2d 485, 503 (E.D. Pa. 2006).

Finally, as to damages, the Third Circuit has been reluctant to grant motions to dismiss based on speculative or complex damages.  <u>See</u> <u>In re Lower Lake Erie Iron Ore Antitrust Litig.</u>, 998 F.2d 1144, 1169 (3d Cir. 1993) ("we do not hold that litigation must be avoided solely because it might be difficult to ascertain damages").  The damages in the present action allegedly stem from overcharges due to Reckitt's scheme to keep the Generics from competing with its product.  These damages do "not appear incapable of accurate calculation" such that the End Payors would not have standing.  <u>Id.</u>  As such, I conclude that, even applying the <u>AGC</u> factors, the End Payors have standing to bring antitrust claims under the state laws that have passed <u>Illinois Brick</u> repealer statutes.

### 2.  Nexus to Intrastate Commerce

Reckitt further argues that the End Payors fail to plead a sufficient nexus between Reckitt's alleged antitrust violations and intrastate commerce under the antitrust laws of Mississippi and Nevada.  Plaintiffs do not dispute the need for this nexus, and respond that the following portion of their amended complaint provides sufficient facts to satisfy the intrastate commerce requirement:

> Reckitt's anticompetitive conduct occurred in part in trade and commerce within the states set forth herein, and also had substantial intrastate effects in that, <u>inter alia</u>, retailers within each state were foreclosed from offering cheaper generic Suboxone to end-payors inside each respective state.  The foreclosure of generic Suboxone directly impacted and disrupted commerce for end-payors within each state, who were forced to pay supracompetitive prices.

(EP Compl. ¶ 152.)

Courts have found that allegations more general than these satisfy the intrastate commerce nexus requirement.  <u>See</u> <u>In re Digital Music Antitrust Litig.</u>, 812 F. Supp. 2d 390, 408

(S.D.N.Y. 2011) (nexus requirement satisfied where complaint alleged the defendants' "conduct was in a continuous and uninterrupted flow of intrastate and interstate commerce") (quotation marks omitted); see also In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d at 580-82.  The cases cited by Reckitt are distinguishable, in that the plaintiffs in those cases solely alleged effects on interstate commerce.  See In re Flonase Antitrust Litig., 610 F. Supp. 2d 409, 416 (E.D. Pa. 2009); California v. Infineon Techs. AG, 531 F. Supp. 2d 1124, 1155-58 (N.D. Cal. 2007).  Therefore, I do not find that dismissal of the Mississippi and Nevada antitrust claims is warranted.

**J.      Have the End Payors Failed to State a Claim Under State Consumer Protection Laws?**

Reckitt argues that all of the remaining consumer protection claims brought under the laws of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New York, Pennsylvania and Virginia must be dismissed for a multitude of reasons.  I address each of these states' consumer protection laws in turn.

**1.  California[22]**

With respect to California's consumer protection law, Cal. Bus. & Prof. Code §§ 17200, et seq., Reckitt simply argues that the End Payors have failed to demonstrate a nexus to intrastate commerce.  For the reasons stated in section III.I.2, supra, I disagree with Reckitt's argument. The End Payors have alleged that overcharges occurred in California, which is sufficient to establish an intrastate nexus.  See Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005) (noting that a plaintiff must allege that either misconduct

_____

[22] While California's antitrust law does not recognize unilateral conduct, as is alleged here, Reckitt has not demonstrated that any such restriction exists as to California's consumer protection law.  Therefore, I will allow California's claims for monopolization and attempted monopolization to proceed under California's consumer protection law.

or injuries occurred intrastate).  As this is Reckitt's only argument to dismiss the End Payors' claim under the California consumer protection law, this claim will survive.

### 2. Florida[23]

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, et seq., prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. Ann. § 501.204.  Reckitt argues that the End Payors have failed to adequately plead fraud or deceit to state a claim under Florida's consumer protection law, especially in light of the particularity required by Federal Rule of Civil Procedure 9(b).  See In re Packaged Ice Antitrust Litig., 779 F. Supp. 2d 642, 665 (E.D. Mich. 2011) (dismissing FDUTPA claims by indirect purchasers for failure to plead fraud or deceit with particularity under Rule 9(b)).  Particularity requires that a plaintiff "plead the circumstances surrounding the alleged fraud in order to put the defendant on notice of the precise misconduct at issue."  De Lage Landen Fin. Servs., Inc. v. Viewpoint Computer Animation, Inc., 2009 WL 902365, at *7 (E.D. Pa. Apr. 1, 2009) (citing Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)).

For the same reasons discussed above regarding the Direct Purchasers, the End Payors' allegations are sufficient to satisfy the particularity requirements of Rule 9(b).  Specifically, they point to claims that Reckitt fabricated a safety issue regarding Suboxone tablets for the sheer purpose of impairing generic competition and eliciting monopoly proceeds from consumers. This false safety issue was then allegedly broadcast to the FDA, doctors, other industry

---

[23] Although Florida's antitrust law does not permit antitrust claims by indirect purchasers and has adopted Illinois Brick, Florida courts have held that the Florida Deceptive and Unfair Trade Practices Act does not have this same restriction.  Mack v. Bristol-Myers Squibb Co., 673 So.2d 100, 110 (Fla. App. 1996).  Therefore, I decline to dismiss the claims for monopolization and attempted monopolization brought under the FDUTPA on Illinois Brick grounds.

participants, and the public in an effort to destroy demand for Suboxone tablets.  Reckitt is also alleged to have made misrepresentations in their Citizen Petition, which the End Payors claim was submitted solely for the purposes of delay.  (<u>See</u> EP Compl. ¶¶ 3, 24-35, 70-82.)  The End Payors provide numerous, specific reasons why Reckitt's actions were false and deceptive. Other cases have found that an allegedly fraudulent Citizens Petition submitted for the purposes of delay could constitute deceptive conduct that would state a claim for violation of state consumer protection laws.  <u>See, e.g.</u>, <u>In re DDAVP Indirect Purchaser Antitrust Litig.</u>, 903 F. Supp. 2d 198, 221-29 (S.D.N.Y. 2012).  Therefore, I find that the End Payors have sufficiently pleaded deception that satisfies the heightened pleading standard under Rule 9(b).

### 3.  Illinois

The Illinois Antitrust Act only permits the state's Attorney General to bring a class action on behalf of indirect purchasers.  740 Ill. Comp. Stat. § 10/7(2).  The End Payors recognize this prohibition, as they have withdrawn their claims under Illinois' antitrust law.  Courts in this district have found that, in light of this prohibition, claims based on alleged antitrust violations under Illinois' consumer protection law must be dismissed.  <u>In re Flonase Antitrust Litig.</u>, 692 F. Supp. 2d 524, 593 (E.D. Pa. 2010) (to allow the indirect purchaser plaintiffs to bring a claim for antitrust conduct under Illinois' consumer protection law "would constitute an end run around the Illinois legislature's determination").  I agree with this assessment and believe the End Payors' claims under the Illinois consumer protection law should be dismissed.

### 4.  Massachusetts

Section 11 of Massachusetts' consumer protection law provides a claim for unfair or deceptive trade practices between businesses, whereas § 9 provides a cause of action to consumers.  <u>See</u> Mass. Gen. L. Ch. 93A §§ 9, 11; <u>Ciardi v. F. Hoffman-La Roche, Ltd.</u>, 762

N.E.2d 303, 308-09 (Mass. 2002).  The state legislature has extended <u>Illinois Brick</u>'s prohibition

on suits by indirect purchasers to § 11 of Massachusetts' consumer protection law, but not § 9.

<u>Ciardi</u>, 762 N.E.2d at 308-09; <u>see</u> <u>also</u> <u>In re Auto. Parts Antitrust Litig.</u>, 2013 WL 2456612, at

*29 (E.D. Mich. June 6, 2013) (dismissing consumer protection claims brought by businesses

under § 11 due to <u>Illinois Brick</u>).  Although the End Payors' complaint is not clear as to whether

they are asserting a claim under § 9 or § 11, their brief implies § 11 would be the appropriate

avenue for their claim.  The End Payors argue that a pre-suit demand, a requirement for § 9

claims, would "not apply to claims brought by businesses like Plaintiffs in this case."  (EP Resp.,

p. 47.)  In any event, even if the End Payors did intend to invoke § 9, they acknowledge that they

did not satisfy the pre-suit demand requirement.  <u>See</u> <u>Entrialgo v. Twin City Dodge, Inc.</u>, 333

N.E.2d 202, 204 (1975) ("A demand letter listing the specific deceptive practices claimed is a

prerequisite to suit and as a special element must be alleged and proved").  Therefore, the End

Payors' claims under Massachusetts' consumer protection law will be dismissed.[24]

### 5. Michigan

Reckitt argues that Michigan's consumer protection law, Mich. Stat. Ann. §§ 445.901, <u>et</u>

<u>seq.</u>, does not prohibit monopolization.  While this statute does require intent to deceive, which

is not required to state a claim for monopolization, <u>see</u> <u>In re Packaged Ice Antitrust Litig.</u>, 779 F.

Supp. 2d at 665-66, for the reasons stated above, the End Payors' complaint pleads with

particularity that Reckitt employed fraudulent and deceptive means with the intent to deceive.

Reckitt further argues that claims under Michigan's consumer protection law require a

plaintiff to demonstrate that it relied on such deceptive conduct when making a purchase.  <u>See</u>

---

[24] As previously noted, Massachusetts' consumer protection law was cited as providing a cause
of action for the End Payors' monopolization and attempted monopolization claims.  These
claims will also be dismissed as barred by <u>Illinois Brick</u>.

Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, 737 F. Supp. 2d 380, 412-13 (E.D. Pa. 2010) (citing Mayhall v. A.H. Pond Co., Inc., 341 N.W.2d 268, 270 (Mich. App. 1983)) (dismissing claims under Michigan's consumer protection law for failure to plead that consumers relied upon misrepresentations and that reliance caused injury). Reliance and causation may be satisfied under the Michigan consumer protection law by demonstrating that plaintiffs purchased and consumed the product. See In re DDAVP, 903 F. Supp. 2d at 226 (citing Gasperoni v. Metabolife, Int'l Inc., 2000 WL 33365948, at *7 (E.D. Mich. Sept. 27, 2000)). Therefore, Reckitt's motion is denied as to this claim.

### 6. Minnesota

Minnesota requires that the pleadings contain specific allegations of fraud or deceit that comply with the heightened standard of Federal Rule of Civil Procedure 9(b). E-Shops Corp. v. U.S. Bank Nat'l Ass'n, 795 F. Supp. 2d 874, 879 (D. Minn. 2011) (holding that Rule 9(b) applies to the Minnesota Consumer Fraud Act, Minn. Stat. Ann. §§ 325F.68, et seq.). For the reasons recited above, the End Payors have pleaded misrepresentations and deception with particularity so as to survive a motion to dismiss. Therefore, the claim under Minnesota's consumer protection law survives Reckitt's motion.

### 7. Missouri

Reckitt argues that the End Payors' claim under Missouri's consumer protection law should be dismissed due to the state's adoption of Illinois Brick. The End Payors point to Gibbons v. J. Nuckolls, Inc., 216 S.W.3d 667 (Mo. 2007) for the proposition that Missouri law does not prohibit their claim. In Gibbons, a consumer sued a car dealership and a wholesaler for failure to disclose that the car he purchased had been in a prior accident. The court held that the consumer may sue the wholesaler, even though direct contractual privity did not exist between

the parties.  While this case does appear to support the assertion that Missouri allows indirect purchasers to bring suit under its consumer protection law, Gibbons did not consider facts in the antitrust context.  The End Payors have failed to identify any cases where indirect purchasers were permitted to bring claims under Missouri's consumer protection law for antitrust injury.  As with Illinois, it would appear that allowing a claim under Missouri's consumer protection law would provide an end-run around the state's prohibition of antitrust claims by indirect purchasers.  See Ireland v. Microsoft Corp., 2001 WL 1868946, at *1 (Mo. Cir. Jan. 24, 2001) (dismissing claims under Missouri's antitrust law and consumer protection statute due to Illinois Brick).  Therefore, the consumer protection claim under Missouri law will be dismissed.

### 8. Nevada

Reckitt also argues that monopolization claims are not actionable under Nevada's consumer protection law, Nev. Rev. Stat. Ann. §§ 598.0903, et seq.  However, that statute prohibits deceptive trade practices, which includes "[k]nowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale."  Nev. Rev. Stat. § 598.0915.  For the reasons stated above, the End Payors have sufficiently pleaded deceptive practices by Reckitt so as to state a claim under Nevada's consumer protection law.  See In re DDAVP, 903 F. Supp. 2d at 226 (finding allegations of fraudulent acts in the antitrust context stated a claim under Nevada's consumer protection law).

### 9. New York

Reckitt also argues that the End Payors have failed to establish a nexus with intrastate commerce as required by New York's consumer protection law, N.Y. Gen. Bus. L. §§ 349, et seq.  As with California, the End Payors have pleaded that overcharges occurred in New York.  Therefore, I do not agree with Reckitt's argument that this claim should be dismissed.  See

<u>Goshen v. Mutual Life Ins. Co. of N.Y.</u>, 774 N.E.2d 1190, 1195 (N.Y. 2002) (transaction in which the consumer is deceived must take place within New York under § 349).

Reckitt further argues that the End Payors failed to adequately plead fraud or deceit directed at consumers. Reckitt cites to <u>In re Wellbutrin XL Antitrust Litig.</u>, 260 F.R.D. 143 (E.D. Pa. 2009), where the court held that the indirect purchasers were too far removed from the allegedly fraudulent action—in that case, filing a sham Citizen Petition—to state a claim under New York's consumer protection law. The target of that deception, the court found, was the FDA, not the indirect purchasers. <u>Id.</u> at 164. Here, however, in addition to the Citizen Petition allegations, the End Payors have posited that Reckitt fabricated safety issues with Suboxone tablets and targeted consumers, among others, in an effort to maintain a monopoly for Suboxone. The End Payors are alleged to have either directly purchased or reimbursed their members—i.e. consumers—for the product. Therefore, I find that the End Payors have successfully stated a claim under New York's consumer protection law.

### 10. Pennsylvania

Reckitt argues that the End Payors have failed to plead fraud or deception with particularity under Pennsylvania's consumer protection law, 73 Pa. Stat. Ann. §§ 201-1, <u>et seq.</u> <u>See</u> <u>In re K-Dur Antitrust Litig.</u>, 338 F. Supp. 2d at 548 (dismissing claim under Pennsylvania's consumer protection law for failure to adequately plead fraud). For the reasons stated above, I disagree with Reckitt's argument, and find that the End Payors have pleaded fraud with particularity. Therefore, Reckitt's motion will be denied as to Pennsylvania's consumer protection law.

### 11. Virginia

Reckitt argues that the End Payors' claim under Virginia's consumer protection law, Va. Code Ann. § 59.1-196, should be dismissed because monopolization allegations are not actionable under the state's consumer protection laws. See <u>In re New Motor Vehicles Canadian Export Antitrust Litig.</u>, 350 F. Supp. 2d 160, 206-07 (D. Me. 2004). For the reasons discussed above, the End Payors have sufficiently pleaded fraud and/or misrepresentations sufficient to state a claim under Virginia's consumer protection law.

### K. <u>Have the End Payors Stated a Claim for Unjust Enrichment</u>?

"Generally speaking, in order to state a claim for unjust enrichment, a plaintiff must allege (1) at plaintiff's expense (2) defendant received [a] benefit (3) under circumstances that would make it unjust for defendant to retain [the] benefit without paying for it." <u>In re K-Dur Antitrust Litig.</u>, 338 F. Supp. 2d at 544 (citing RESTATEMENT OF RESTITUTION § 1 (1937)).

Reckitt presents two arguments as to why all of the End Payors' unjust enrichment claims should be dismissed. First, Reckitt argues that the End Payors failed to adequately identify the state laws under which they assert such claims, and that failure to do so warrants dismissal. See <u>In re Auto. Parts Antitrust Litig.</u>, 2013 WL 2456612, at *31 (dismissing unjust enrichment claims because plaintiffs pleaded general common law unjust enrichment without identifying under which states they were bringing these claims); <u>In re Wellbutrin XL</u>, 260 F.R.D. at 167 (same). However, the End Payors' complaint does allege which states' unjust enrichment laws were violated. Unlike the plaintiffs in the cases cited by Reckitt, here the End Payors invoked the laws of all fifty states (except Ohio and Indiana) and the District of Columbia. Therefore, I am not convinced that all of the End Payors' unjust enrichment claims should be dismissed on this ground.

54

Reckitt's second argument for complete dismissal of the unjust enrichment claims is that the End Payors did not plead the specific elements of any state's unjust enrichment law or the factual allegations that support recovery under those laws.  While it is true that the elements of unjust enrichment vary state by state, "almost all states at minimum require plaintiffs to allege that they conferred a benefit or enrichment upon defendant and that it would be inequitable or unjust for defendant to accept and retain the benefit."  In re Flonase, 692 F. Supp. 2d at 541.  The facts set forth in the End Payors' complaint allege that Reckitt obtained ill-gotten gains—that is, monopoly profits unlawfully obtained.  To the extent that a jurisdiction invoked by the End Payors requires state-specific elements that have not been satisfied by these allegations, these alleged deficiencies are addressed below.

Next, Reckitt contends that any and all "autonomous" unjust enrichment claims—claims that are not derived from a violation of some other state law—must be dismissed.  Unjust enrichment claims can generally take one of two forms: (1) parasitic, which means it "arise[s] from contracts, torts, or other predicate wrongs"; or (2) autonomous, where the unjust enrichment claim alone "may also serve as independent grounds for restitution in the absence of mistake, wrongdoing, or breach of contract."   In re New Motor Vehicles Canadian Export Antitrust Litig., 350 F. Supp. 2d at 207-08 (citation omitted).  As with the consumer protection laws, courts have held that an autonomous unjust enrichment may not be used as an end-run around a state's prohibition against antitrust claims brought by indirect purchasers in accordance with Illinois Brick.[25]  See id. at 207-10; In re Digital Music Antitrust Litig., 812 F. Supp. 2d at

---

[25] The End Payors cite to Cephalon, 702 F. Supp. 2d at 539, for the proposition that this Court has previously rejected the end-run argument with regard to unjust enrichment claims.  However, Illinois Brick and various states' adoption of this limitation were not discussed in Cephalon.  See id. at 539-40.

413; In re Flonase, 692 F. Supp. 2d at 542.  States that have adopted Illinois Brick and do not provide a cause of action under either the states' antitrust law or consumer protection law, are: Illinois, Kentucky,[26] Massachusetts, Missouri and New Jersey.[27]  Therefore, these autonomous claims for unjust enrichment will be dismissed.

To the extent that Reckitt argues that other states do not allow a stand-alone claim for unjust enrichment, I will address these states individually below.

### 1. Alabama

With respect to Alabama's unjust enrichment law, Reckitt first argues that because the End Payors did not plead underlying antitrust or consumer protection claims under Alabama law, the Alabama unjust enrichment claims must be dismissed.  Reckitt does not cite to any Alabama case law that states an unjust enrichment claim cannot stand on its own as an independent cause of action.  Therefore, I will not grant the motion on this ground.

Reckitt next argues that the End Payors failed to allege that they acted under a mistake of fact or in misreliance on a duty, or that Reckitt engaged in any unconscionable conduct, as required by Alabama law.  See Matador Holdings, Inc. v. HoPo Realty Invs., LLC, 77 So.3d 139, 146 (Ala. 2011).  Alabama courts define unconscionable conduct to include "fraud, coercion, or abuse."  Id. at 146 (quoting Jordan v. Mitchell, 705 So.2d 453, 458 (Ala. Civ. App. 1997)).  As discussed previously, the End Payors have alleged that Reckitt engaged in unconscionable conduct through fraud and that indirect purchasers relied upon this fraud, resulting in injury. Therefore, the motion to dismiss the Alabama unjust enrichment claim is denied.

---

[26] Arnold v. Microsoft Corp., 2001 WL 1835377, at *7 (Ky. Ct. App. Nov. 21, 2001) (applying the holding of Illinois Brick to Kentucky's antitrust law).

[27] Sickles v. Cabot Corp., 877 A.2d 267, 275 (N.J. Super. App. Div. 2005) ("an indirect purchaser is precluded from suing for antitrust violations under the [New Jersey Antitrust statute]").

### 2. Alaska

The only argument raised as to Alaska is that unjust enrichment cannot be an autonomous, stand-alone claim.  In support of its argument, Reckitt cites to <u>Alaska Sales & Serv., Inc. v. Millet</u>, 735 P.2d 743, 746 (Alaska 1987).  However, Reckitt misreads this case.  The <u>Millet</u> court simply noted that unjust enrichment "is a prerequisite for the enforcement of the doctrine of restitution" and noted that courts often "treat actions brought upon theories of unjust enrichment, quasi-contract, contracts implied in law and <u>quantum</u> <u>meruit</u> as essentially the same."  <u>Id.</u> at 746 n.6.  It did not hold that unjust enrichment could not be an autonomous cause of action.  Therefore, Reckitt's motion will be denied as to Alaska.

### 3. California

Reckitt argues that the claim for unjust enrichment under California law must be dismissed because California does not recognize a cause of action for unjust enrichment.  Courts have recognized that there is inconsistent precedent within California as to whether a claim for unjust enrichment is viable.  <u>See</u> <u>Baggett v. Hewlett-Packard Co.</u>, 582 F. Supp. 2d 1261, 1270-71 (C.D. Cal. 2007) ("California courts appear to be split on whether unjust enrichment can be an independent claim or merely an equitable remedy") (quotation marks omitted); <u>compare</u> <u>Dunkel v. eBay Inc.</u>, 2013 WL 415584, at *11 (N.D. Cal. Jan. 31, 2013) ("Simply put, there is no cause of action in California for unjust enrichment") (quotation marks and citations omitted) <u>with</u> <u>Peterson v. Cellco Partnership</u>, 80 Cal. Rptr. 3d 316, 323-24 (Cal. App. 2008) (analyzing whether plaintiff had stated a claim for unjust enrichment without finding that it was unavailable under California law).

In the absence of clear authority on this issue, I find the analysis in <u>Baggett</u> to be persuasive.  Therein, the court noted that it was unclear whether unjust enrichment was a viable

cause of action in California, and in any event, found that courts seem particularly reluctant to allow an unjust enrichment claim where the remedies available for plaintiff may be pursued under other claims.  Baggett, 582 F. Supp. 2d at 1271; see also Falk v. General Motors Corp., 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007).  Here, the End Payors' have brought a viable claim for violation of California's consumer protection law, and "the unjust enrichment claim will add nothing to [their] available relief."  Baggett, 582 F. Supp. 2d at 1271.  Therefore, I will dismiss the unjust enrichment claim under California law.

### 4. Florida

Reckitt initially argues that because Florida does not permit antitrust claims by indirect purchasers, the End Payors' unjust enrichment claim must also be dismissed as an end-run around this restriction.  However, as discussed above, Florida does permit indirect purchasers to bring claims under the state's consumer protection law.  Therefore, because there exists a viable underlying cause of action, I do not agree with Reckitt's argument.  See Flonase, 692 F. Supp. 2d at 543-44.

However, I do find that Florida law requires that a benefit be conferred upon the defendant directly in order to state a claim for unjust enrichment.  See Extraordinary Title Servs., LLC v. Fla. Power & Light Co., 1 So.3d 400, 404 (Fla. 3d D.C.A. 2009) (affirming dismissal of unjust enrichment claim for failure to demonstrate that a benefit was directly conferred on the defendant); Am. Safety Ins. Serv., Inc. v. Griggs, 959 So.2d 322, 331 (Fla. 5th D.C.A. 2007) (citing People's Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla., 667 So.2d 876, 879 (Fla. 3d D.C.A. 1996)) ("The plaintiffs must show they directly conferred a benefit on the defendants"); Flonase, 692 F. Supp. 2d at 544 (citing Nova Info. Sys., Inc. v. Greenwich Ins. Co., 365 F.3d 996, 1007 (11th Cir. 2004)) ("As best I can tell, Florida law is clear; it requires

that a plaintiff confer a direct benefit upon a defendant in order to state a claim for unjust enrichment").[28]

By virtue of being indirect purchasers, the End Payors cannot establish that they directly conferred a benefit upon Reckitt.  The facts pleaded in the End Payors' complaint establish that any overpayments for Suboxone were made to pharmacies, and the End Payors had no direct contact with Reckitt.  Therefore, I will grant Reckitt's motion as to the End Payors' Florida unjust enrichment claim.

### 5. Iowa

Reckitt first argues that the unjust enrichment claim arising under Iowa law must be dismissed because the End Payors did not allege that they conferred a direct benefit on Reckitt. However, the Supreme Court of Iowa has held that the benefits conferred to a defendant in an unjust enrichment claim may be "direct or indirect, and can involve benefits conferred by third parties."  State, Dep't of Human Servs. ex rel. Palmer v. Unisys Corp., 637 N.W.2d 142, 155 (Iowa 2001).   Instead of concentrating on the privity between the two parties, the "critical inquiry is that the benefit received be at the expense of the plaintiff."  Id.  Thus, I do not agree with Reckitt's first argument.

---

[28] I note that some Florida precedent has not been entirely clear that the conferral of a direct benefit is required.  See Merkle v. Health Options, Inc., 940 So.2d 1190, 1199 (Fla. 4th D.C.A. 2006); Hillman Constr. Corp. v. Wainer, 636 So.2d 576, 577-78 (Fla. 4th D.C.A. 1994). Although these cases allowed claims to proceed where there did not appear to be a direct benefit conferred, at no point did the court make a clear statement that a direct benefit was not required. Furthermore, the appellate courts' reasoning in reversing the trial courts' dismissals seemed to focus on the trial courts improperly making factual determinations that a benefit was not conferred, as opposed to adopting the factual allegations made in the complaint.  I do not find that these ambiguous rulings are sufficient to overcome the majority of Florida precedent that has clearly and affirmatively held that a direct benefit is required for an unjust enrichment claim under Florida law.

Next, Reckitt argues that the Iowa unjust enrichment claim should be dismissed because the End Payors received the benefit of the bargain, citing to <u>Smith v. Stowell</u>, 125 N.W.2d 795, 800 (Iowa 1964).  In <u>Smith</u>, the plaintiffs sold ten shares of stock to the defendant, and the parties entered into an express contract where the plaintiffs reserved the option to repurchase the shares from the defendant at a set price.  <u>Id.</u> at 796.  Years later, the plaintiffs sought to repurchase the ten shares but also wanted thirty additional shares that had been awarded to the defendant as a stock dividend.  <u>Id.</u>  The defendant was willing to sell the original ten shares at the agreed upon price, but not the stock dividends.  <u>Id.</u> at 800.  The court held that "there can be no such implied contract on a point fully covered by an express contract and in direct conflict therewith."  <u>Id.</u>  This case is clearly distinguishable from the present case, as there is no express written contract between the parties.  <u>See</u> <u>In re Auto. Parts Antitrust Litig.</u>, 2014 WL 2993753, at *29-30 (E.D. Mich. July 3, 2014) (distinguishing <u>Smith</u> due to the express written contract).

I also find that the sheer fact that the End Payors received medication in exchange for money paid does not bar an unjust enrichment claim.  Reckitt has not established that <u>any</u> consideration exchanged for a benefit conferred defeats a claim for unjust enrichment.  Instead, the precedent indicates that courts inquire as to the "fairness" of the consideration, which would appear to be a factual issue inappropriate for disposition in a motion to dismiss.  <u>See</u> <u>In re K-Dur Antitrust Litig.</u>, 338 F. Supp. 2d at 545-46 (collecting cases considering the fairness or justness of the bargain).  The End Payors have alleged that although they received Suboxone in exchange for their payments, they were forced to pay artificially inflated prices due to Reckitt's wrongful conduct.  This is sufficient to state a claim for unjust enrichment under Iowa law.

### 6. **Michigan**

Reckitt first argues that the End Payors' unjust enrichment claim under Michigan law should be dismissed because Michigan requires a showing of a direct benefit conferred on the defendants. It primarily relies on A & M Supply Co. v. Microsoft Corp., 2008 WL 540883 (Mich. Ct. App. Feb. 28, 2008), and several other cases citing to A&M. See In re Refrigerant Compressors Antitrust Litig., 2013 WL 1431756, at *25-26 (E.D. Mich. Apr. 9, 2013); In re Aftermarket Filters Antitrust Litig., 2010 WL 1416259, at *2-3 (N.D. Ill. Apr. 1, 2010); In re Potash Antitrust Litig., 667 F. Supp. 2d 907, 948-49 (N.D. Ill. 2009); Munson v. Countrywide Home Loans, Inc., 2008 WL 5381866, at *9 (E.D. Mich. Dec. 17, 2008).

In A & M, the Michigan Court of Appeals affirmed the trial court's dismissal of an unjust enrichment claim due to the plaintiff's failure to prosecute the case. 2008 WL 540883, at *1-2. The court further noted that "even if the lower court had erred in dismissing a plaintiff's action for lack of progress, it was properly subject to dismissal on the merits." Id. at *2. The court reasoned that a direct benefit is required under Michigan unjust enrichment law and the plaintiff failed to show a direct relationship between himself and the defendants. Id. However, the court provided no precedent in support of its assertion.

I agree with the reasoning presented by a court in the Eastern District of Michigan. In re Auto. Parts Antitrust Litig., 2014 WL 2993753, at *31. The In re Auto. Parts court found that A & M is not persuasive or dispositive, largely because the language regarding a direct benefit requirement was made in dicta. Id. The district court ultimately held that "Michigan law does not require a benefit to be conferred directly by plaintiff to a defendant" and denied the defendants' motion to dismiss on this ground. Id.

Several Michigan courts have reached the same conclusion.  <u>See</u> <u>Kammer Asphalt Paving</u> <u>Co. v. E. China Twp. Sch.</u>, 504 N.W.2d 635, 641 (Mich. 1993) (allowing an indirect benefit to constitute unjust enrichment because of the close relationship between the parties); <u>Morris</u> <u>Pumps v. Centerline Piping, Inc.</u>, 729 N.W.2d 898, 904 (Mich. Ct. App. 2006) (finding the defendant, a general contractor, liable for unjust enrichment where the defendant used materials that the plaintiff had supplied to another subcontractor and did not pay the plaintiff for those materials).  Several federal courts interpreting Michigan law have also determined that unjust enrichment does not require a direct benefit.  <u>See</u> <u>In re Static Random Access Memory (SRAM)</u> <u>Antitrust Litig.</u>, 2010 WL 5094289, at *7 (N.D. Cal. Dec. 8, 2010) ("A claim for unjust enrichment under Michigan law does not require that the plaintiff confer a direct benefit on the defendant"); <u>In re K-Dur Antitrust Litig.</u>, 2008 WL 2660783, at *10 (D.N.J. Mar. 19, 2008) (holding that a plaintiff is not required to show a direct benefit while noting the inconsistency in the case law); <u>In re Cardizem CD Antitrust Litig.</u>, 105 F. Supp. 2d 618, 670-71 (E.D. Mich. 2000) (rejecting that "either privity or a directly conferred benefit is an essential element of an unjust enrichment claim under" Michigan common law).  Without a clear pronouncement from the Michigan state courts, I will allow the End Payors' unjust enrichment claim under Michigan law to proceed.  <u>See</u> <u>Flonase</u>, 692 F. Supp. 2d at 544 ("[T]here should be a clear statement from the state's courts that it has added" the direct benefit requirement).

Reckitt next argues that the End Payors received the benefit of the bargain.  Reckitt cites to two cases where the court of appeals dismissed unjust enrichment claims where the parties negotiated an explicit contract, and both parties fulfilled their obligations under that contract. <u>See</u> <u>Isom v. NE Lots LLC</u>, 2010 WL 143470, at *6 (Mich. Ct. App. Jan. 14, 2010); <u>Russell v.</u> <u>Zeemering</u>, 2006 WL 2382511, at *5 (Mich. Ct. App. Aug. 17, 2006).  Because there is no

explicit contract in this case, I find these cases to be distinguishable.  Accordingly, Reckitt's motion to dismiss the unjust enrichment claims in Michigan will be denied.

### 7. Minnesota

Reckitt first argues that Minnesota requires a direct benefit to be conferred onto the defendant in order to state a claim for unjust enrichment.  The only authority it provides in support of this assertion is Schumacher v. Schumacher, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001).  However, Schumacher does not state that a direct benefit is an essential element to an unjust enrichment claim.  There, the court found that "the claimant must show that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit."  Id. at 729.  I am not convinced that Schumacher conclusively establishes that Minnesota law requires a direct benefit. See In re Processed Egg Prods. Antitrust Litig., 851 F. Supp. 2d 867, 934-35 (E.D. Pa. 2012) (finding that Minnesota does not have a "direct benefit" requirement).

Reckitt also argues that the End Payors received the benefit of the bargain.  It cites one case where the plaintiff, a college student who did not receive a degree upon paying tuition, claimed the university was unjustly enriched.  Zinter v. Univ. of Minn., 799 N.W.2d 243, 247 (Minn. Ct. App. 2011).  The court rejected the argument, noting that what was bargained for was tuition in exchange for classes, not tuition in exchange for a degree.  Id.  The case before me is distinguishable.  As described with regard to Iowa law, the fact that some consideration was exchanged does not foreclose the End Payors' claim.  Instead, the operative question is whether the bargain was just or fair.  Therefore, I do not agree with Reckitt's argument.

Lastly, Reckitt argues that the End Payors are barred from bringing unjust enrichment claims when they have adequate legal remedies available, citing to Southtown Plumbing, Inc. v.

Har-Ned Lumber Co., Inc., 493 N.W.2d 137 (Minn. Ct. App. 1992).  The court in Southtown held that because the plaintiffs chose not to pursue the legal remedy available to them through a mechanics lien, they were barred from then bringing an unjust enrichment claim.  Id. at 140. Reckitt seeks to use this case to show that unjust enrichment is always barred when a legal remedy is available.   However, several courts applying Minnesota law have allowed simultaneous pleadings for a legal remedy and unjust enrichment.  See Daigle v. Ford Motor Co., 713 F. Supp. 2d 822, 828 (D. Minn. 2010); LePage v. Blue Cross & Blue Shield of Minn., 2008 WL 2570815, at *8 (D. Minn. June 25, 2008); see also In re Levaquin Prods. Liab. Litig., 752 F. Supp. 2d 1071, 1081 (D. Minn. 2010) (finding that Southtown only stands for the proposition that a plaintiff who chooses not to pursue available legal remedies cannot recover for unjust enrichment).  Therefore, I will allow the Minnesota unjust enrichment claim to proceed.

### 8. Mississippi

Reckitt next argues that because the End Payors received the benefit of the bargain, the Mississippi unjust enrichment claims should be dismissed. It cites to one case that discusses unjust enrichment as it applies to third parties.  Omnibank of Mantee v. United S. Bank, 607 So. 2d 76, 92-93 (Miss. 1992).  There, the court held that the mere fact that a party is enriched does not mean that he has been unjustly enriched, "in the absence of some misleading or wrongful act."  Id.  The court did not state that any consideration provided by the defendant for a benefit precludes an unjust enrichment claim.   Furthermore, Reckitt is alleged to have engaged in wrongful, fraudulent acts.  Therefore, I do not find Reckitt's argument convincing.

Reckitt also argues that under Mississippi law, plaintiffs can only recover for unjust enrichment when the payment was made by a mistake of fact.  Reckitt points to the holdings of two Mississippi Supreme Court cases.  Willis v. Rehab Solutions, PLLC, 82 So.3d 583, 588

(Miss. 2012); <u>Union Nat'l Life Ins. Co. v. Crosby</u>, 870 So.2d 1175, 1180 (Miss. 2004). These cases defined unjust enrichment as applying when one party mistakenly pays another party, reasoning that the receiver should not be enriched at the expense of the giver. <u>Id.</u> While the court did hold that "unjust enrichment applies when one party has mistakenly paid another party," <u>Willis</u>, 82 So. 3d at 388, Reckitt overstates the import of this holding. <u>See</u> <u>In re Auto. Parts Antitrust Litig.</u>, 2014 WL 2993742, at *34-35 (rejecting an identical argument as construing <u>Willis</u> too broadly). In fact, after deciding <u>Willis</u>, the Supreme Court of Mississippi found a claim for unjust enrichment was viable where there were no allegations of mistake, but instead the defendant "knowingly solicited [the plaintiff] to enter into an unlawful contract" and found it would be unconscionable to allow the defendant to retain those ill-gotten gains. <u>Ground Control, LLC v. Capsco Indus., Inc.</u>, 120 So.3d 365, 371 (Miss. 2013). Therefore, I do not agree with Reckitt that Mississippi law requires plaintiffs to plead a mistake in order to state a claim for unjust enrichment.

### 9. Nevada

Reckitt's only argument in support of its motion to dismiss the Nevada unjust enrichment claim is that Reckitt provided consideration for any benefit conferred. For support, Reckitt cites <u>Bowyer v. Davidson</u>, 584 P.2d 686, 687 (Nev. 1978). The <u>Bowyer</u> court found that because the defendant provided the consideration that the parties had bargained for in their express contract, he could not have been unjustly enriched. <u>Id.</u> As with Iowa, the facts in the present case are distinguishable. Therefore, the End Payors' unjust enrichment claim under Nevada law will survive the motion to dismiss.

### 10.  New York

With regard to the New York unjust enrichment claims, Reckitt argues that the End Payors must demonstrate that a direct benefit was conferred upon the defendant.  A review of New York case law indicates that in order to state a claim for unjust enrichment, the relationship between the plaintiff and the defendant, and thus the conferral of the benefit, must not be "too attenuated."  See Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182-83 (N.Y. 2011) (noting that an unjust enrichment claim will fail if the connection between the parties is too attenuated).

Reckitt argues that this case is similar to Sperry v. Crompton Corp., 8 N.Y.3d 204 (N.Y. 2007), where the New York Supreme Court affirmed the dismissal of an unjust enrichment claim because the conferral of the benefit was too attenuated.  The plaintiffs in that case, purchasers of tires, brought antitrust and unjust enrichment claims against the producer of chemicals used in tire manufacturing.  The plaintiffs alleged that the tire manufacturers, who had been overcharged for the chemicals, passed along the overcharges to retailers, and by extension, consumers.  Id. at 209.  In the absence of a connection between the two parties, the court found that the unjust enrichment claim could not survive.  Id. at 215-16.

I agree with the court's analysis in Waldman v. New Chapter, Inc., 714 F. Supp. 2d 398 (E.D.N.Y. 2010), which distinguishes Sperry.  Waldman held that although an indirect purchaser could not bring a claim against the producer of an ingredient used in a product, that did not foreclose an indirect purchaser from pursuing an unjust enrichment claim against the manufacturer of the product itself.  Id. at 403-04 (citing Cox v. Microsoft Corp., 8 A.D.3d 39, 40-41 (N.Y. App. Ct. 1st Dept. 2004)).  Accordingly, I do not find that the End Payors are too

attenuated from Reckitt so as to require dismissal of the unjust enrichment claim under New York law.

### 11. Pennsylvania

Reckitt argues that the End Payors are barred from bringing an unjust enrichment claim in Pennsylvania because that state does not allow indirect purchasers to bring antitrust claims under Illinois Brick.   However, as opposed to simply barring claims brought by indirect purchasers, Pennsylvania does not have a state antitrust statute at all.  See XF Enterprises, Inc. v. BASF Corp., 2000 WL 33155746, at *1 (Pa. Com. Pl. Ct. July 13, 2000).  In any event, because I have previously found that the End Payors have stated a claim for a violation of Pennsylvania's consumer protection law, I do not find that allowing an unjust enrichment claim would provide an end-run around the Pennsylvania legislature's determination.  Accordingly, the End Payors' unjust enrichment claim under Pennsylvania law will survive the motion to dismiss.

### 12. Virginia

Reckitt initially argues that the End Payors cannot bring an autonomous unjust enrichment claim.  However, I have already found that the End Payors' claim under Virginia's consumer protection law may proceed.  Therefore, I disagree with Reckitt's argument.  For the same reason, I disagree with Reckitt's argument that to allow a claim for unjust enrichment in Virginia would act as an end-run around the state's prohibition of antitrust claims by indirect purchasers.  Therefore, the End Payors' claim for unjust enrichment under Virginia law will survive the motion to dismiss.

### 13. Wisconsin

The only argument Reckitt provides in support of its motion to dismiss the unjust enrichment claim arising under Wisconsin law is that Reckitt has already provided consideration

for any benefit conferred.  It cites to a Wisconsin Court of Appeals case where a subcontractor was barred from bringing an unjust enrichment claim against an owner that had already paid a general contractor for the services provided.  <u>Tri-State Mech., Inc. v. Northland Coll.</u>, 681 N.W.2d 302, 305-06 (Wis. Ct. App. 2004). Similar to my reasoning under Florida law, the present case is distinguishable.  <u>Tri-State</u> did not state that any consideration exchanged would nullify a claim for unjust enrichment.  Therefore, the motion to dismiss the unjust enrichment claims under Wisconsin law is denied.

**L.   <u>Should the End Payors' Claim for Injunctive Relief Be Dismissed?</u>**

Reckitt argues that the End Payors' claim for injunctive relief under § 16 of the Clayton Act should be dismissed as it is procedurally and substantively deficient.  First, Reckitt asserts that because the End Payors seek the exact relief in their § 16 claim as the Direct Purchasers, the claim should be dismissed as duplicative.  Citing to <u>Howard Hess Dental Laboratories, Inc. v. Dentsply International, Inc.</u>, 602 F.3d 237 (3d Cir. 2010), Reckitt asserts that where no meaningful difference exists between the cases of the parties seeking an injunction, the End Payors' request for injunctive relief should be dismissed.  I disagree.

In <u>Howard Hess</u>, the court denied the plaintiff's motion for summary judgment because the plaintiff had not established antitrust injury where a nearly identical injunction to that sought by the plaintiff had <u>already been granted</u> to the Government.  <u>Id.</u> at 249.  At no point did the court state that dismissal was appropriate through a motion to dismiss where two groups of plaintiffs sought the same injunction.  In fact, the <u>Howard Hess</u> court noted that it was unaware of any antitrust authority that would "require the Plaintiffs to have established a need for an injunction that was 'non-duplicative.'"  <u>Id.</u>  While <u>Howard Hess</u> recognizes that the court may consider an injunction that is already in place in deciding whether antitrust injury exists, that is

much different from requiring dismissal here.  At the very least, the End Payors should be granted the opportunity to present evidence of their injury at the summary judgment stage.

Next, Reckitt argues that the End Payors lack standing to seek injunctive relief under § 16 of the Clayton Act because they fail to allege any ongoing or future injury that would be remedied by an injunction.  Specifically, Reckitt asserts that the only injury that is identified is the past payment of allegedly inflated prices due to the supposed delayed market entry of generic Suboxone tablets.  The End Payors respond that the harm they suffer is ongoing because Reckitt destroyed the market for Suboxone tablets and they are continuing to pay artificially inflated prices for an inferior film product.  The End Payors urge that this injury may be remedied by an injunction through compulsory licensing of the film patents to generic competitors, or by way of mandated reduction in Reckitt's price of the branded film.  I agree with the End Payors that, as they have stated a claim for antitrust injury through the product-hopping scheme, and the scheme has allegedly damaged the market for generic Suboxone tablets significantly, the injury is ongoing and injunctive relief may be sought.  Reckitt's reliance on In re DDAVP, is misplaced, as the patent in that case had been invalidated, and thus there was no risk of continued supra-competitive prices.  903 F. Supp. 2d at 210-11.

Finally, Reckitt argues that the End Payors' claim for injunctive relief should be dismissed because they have failed to state an underlying violation of the antitrust laws.  As I have found that Plaintiffs have stated a claim for antitrust violations, the End Payors' claim for injunctive relief will survive.

### M.  Have Plaintiffs Sufficiently Pleaded Market Power and a Relevant Market?

As noted previously, in order to state a claim for monopolization, a plaintiff must plausibly allege "(1) the possession of monopoly power in the relevant market and (2) the willful

acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Grinnell, 384 U.S. at 570-71.  Reckitt argues that both of Plaintiffs' complaints should be dismissed for failure to sufficiently allege monopoly power.[29]  "Monopoly power is the ability to control prices and exclude competition in a given market." Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 307 (3d Cir. 2007) (citing Grinnell, 384 U.S. at 571).

Reckitt argues that in order to allege market power, a plaintiff must first define the relevant market.  While relevant market inquiries are generally fact-intensive, and dismissal on this ground is disfavored in a motion to dismiss,

> [w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997).

Plaintiffs respond that they have met the monopoly power requirement in two distinct ways: (1) directly, through allegations that Reckitt's conduct caused anticompetitive effects; and (2) indirectly, through allegations of Reckitt's dominant share of the relevant market.  Where direct evidence of monopoly power is provided, Plaintiffs assert that definition of a relevant market is not required.  In support of this argument, Plaintiffs cite to Broadcom, where the Third Circuit stated in a footnote that "[b]ecause market share and barriers to entry are merely

---

[29] Reckitt also incorporates these arguments into its motion to dismiss the Direct Purchasers' complaint.  The Direct Purchasers have adopted the arguments made by the End Payors; however, they acknowledge that they inadvertently failed to include certain allegations regarding market power that had previously been pleaded in one Direct Purchaser's original complaint. (See Dkt. No. 13-1164, Doc. No. 1, ¶¶ 98-104.)  They state that they intend to file a consolidated second amended complaint to re-insert those averments upon disposition of this motion.

surrogates for determining the existence of monopoly power, direct proof of monopoly power does not require a definition of the relevant market."  501 F.3d at 307 n.3 (citation omitted). While this statement appears to provide support to Plaintiffs' argument, cases decided subsequent to Broadcom have found that at least a rough identification of the relevant market is still required in direct evidence cases, although perhaps not with the same level of precision as required for claims proven through indirect evidence.  See, e.g., In re Neurontin Antitrust Litig., 2013 WL 4042460, at *3 (D.N.J. Aug. 8, 2013) (collecting cases).

Plaintiffs urge that they have alleged direct evidence of supra-competitive prices and restricted output.  I agree.  Specifically, Plaintiffs have alleged that: (1) Reckitt successfully impaired and excluded generic competition; (2) Reckitt's conduct resulted in supra-competitive prices; (3) no firm was able to respond to Reckitt's high prices by increasing output of competing goods; and (4) consumer welfare suffered from the lack of competing goods in a high-price environment—all of which demonstrates Reckitt's ability to control prices and exclude competition.

Further, I need not reach the question of whether identification of a relevant market is required to establish monopoly power in direct evidence cases because Plaintiffs have also adequately defined a relevant market so as to survive a motion to dismiss.  A relevant market is defined by a products' reasonable interchangeability of use or cross-elasticity of demand between the product and its substitutes.  Queen City Pizza, 124 F.3d at 436 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)).  Reasonable interchangeability considers whether two products are roughly equivalent when put to a specific use, and considers factors such as price, use and qualities.  Id. at 437.  Cross-elasticity of demand considers whether "the rise in the price of a good within a relevant product market would tend to create a greater

demand for other like goods in that market."  Id. at 437-38 (quoting Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991)).

Plaintiffs have alleged that Suboxone is a unique product and that the relevant product market is limited to Suboxone in all of its forms and dosage strengths and its AB-rated generic bioequivalents.  They further allege that "Suboxone does not exhibit significant, positive cross-elasticity of demand with respect to price, with any opioid dependence treatment or other product other than AB-rated generic versions of Suboxone."   The complaint further explains that Suboxone is unique because it is the only opioid replacement maintenance therapy that can be prescribed in an office setting and taken by patients at home because it is categorized as a Schedule III drug and co-formulated with an opioid antagonist to deter abuse.   (EP Compl. ¶¶ 153-59.)  Methadone, for example, is a Schedule II drug and must be administered in a clinic. Further, Subutex, another opioid treatment drug marketed by Reckitt, is not alleged to be reasonably interchangeable because it lacks the opioid agonist, and therefore is not recommended for maintenance therapy.  I must accept these statements as true.

Dismissal at the motion to dismiss stage for failure to define a relevant market is disfavored.   Plaintiffs have referenced the rules of reasonable interchangeability and cross-elasticity of demand and have plausibly explained why other similar products do not fall within the relevant market.   These allegations are sufficient to state a claim and survive a motion to dismiss, to the extent that a relevant market analysis is even necessary where direct evidence of monopoly power is provided.[30]

---

[30] The allegations present in the Direct Purchasers' consolidated amended complaint also establish direct evidence of monopoly power, and to the extent required to establish a relevant market, identify it in a similar manner as the End Payors—that is, that the relevant market includes Suboxone in all of its forms and dosage strengths, including generics.  They also briefly include an explanation as to why Suboxone does not have cross-elasticity of demand with other

### N.   Should the Four Additional Reckitt Defendants Be Dismissed?

In addition to Reckitt Benckiser Pharmaceuticals, Inc., which actually sells Suboxone, Plaintiffs have named four additional corporate entities as Defendants: Reckitt Benckiser, Inc., Reckitt Benckiser LLC, Reckitt Benckiser Healthcare (UK) Ltd., and Reckitt Benckiser Group plc.  Reckitt argues that these four additional Defendants should be dismissed for failure to identify what role, if any, these entities played in the alleged anticompetitive scheme.[31]  In their response, the End Payors only argue that Reckitt Benckiser Group plc and Reckitt Benckiser Healthcare (UK) Ltd. should not be dismissed.  At no point do the End Payors address Reckitt's argument that no allegations have been raised against Reckitt Benckiser Inc. or Reckitt Benckiser LLC.  Accordingly, the motion will be granted as unopposed as to these two Defendants.

As to Reckitt Benckiser Group plc, the End Payors point to allegations in their complaint that its board of directors "were advised of the generic-impairing purpose of the product hop

---

opioid dependence treatments.  For the reasons explained in this section, I am not inclined to grant a motion to dismiss on monopoly power grounds, particularly where the Third Circuit has articulated that dismissal at this stage is disfavored and where it is unclear that a relevant market definition is required at all where direct evidence of monopoly power has been provided.  I accept the Direct Purchasers' allegations regarding the relevant market, but acknowledge that it is a close call and urge them to file the second amended complaint to include more substantial facts on this issue.

[31] Reckitt adopts the arguments in this section as to the Direct Purchasers as well.  The Direct Purchasers do not respond, nor do they adopt the End Payors' response on this issue.  The only allegation in the Direct Purchasers' complaint regarding these additional Reckitt entities is that they "manufacture[ ] and market[ ] numerous products, including pharmaceuticals subject to FDA approval, and w[ere] in whole or in part responsible for some or all of the conduct alleged herein and attributed to Reckitt."  (DP Compl. ¶¶ 19-23.)  These bare bones allegations are not sufficient to establish liability against these additional Reckitt entities.  See In re Mushroom Direct Purchaser Antitrust Litig., 514 F. Supp. 2d 683, 699 (E.D. Pa. 2007) ("In order to sustain their claims of monopolization and attempted monopolization, Plaintiffs must . . . prove the required elements against each individual defendant.") (quoting Carpet Group Int'l v. Oriental Rug Imps. Assoc., 256 F. Supp. 2d 249, 284 (D.N.J. 2003)); see also In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 417 (S.D.N.Y. 2011).  Accordingly, as to the Direct Purchasers, these four additional Reckitt entities will be dismissed.

from Suboxone tablets to film, and of the related anticompetitive tactics, and specifically approved the scheme and its purpose.   The board of directors approved and directed this anticompetitive scheme over the course of many years, including the period encompassing the mid-2000s."  (EP Compl. ¶ 83.)   While this is sufficient to establish Reckitt Benckiser Group plc's role in the alleged scheme, the only allegation made by the End Payors for Reckitt Benckiser Healthcare (UK) Ltd. is that they conducted a similar product-hopping scheme in the United Kingdom involving the product Gaviscon.   However, these allegations do not tie Reckitt Benckiser Healthcare (UK) Ltd. to the actions taken with respect to Suboxone.   Therefore, I agree that the claims against Reckitt Benckiser Healthcare (UK) Ltd. should also be dismissed.

**O.   <u>Should the Claims Asserted by Certain End Payors Be Dismissed for Failure to Serve the Complaint?</u>**

Finally, I address Reckitt's argument that the claims brought by certain End Payors should be dismissed for failure to effectuate service.   It appears that four End Payors have failed to serve Reckitt Benckiser Healthcare (UK) Ltd. and Reckitt Benckiser Group plc., and that one End Payor has failed to serve any Defendant.[32]   The End Payors do not dispute that these Plaintiffs failed to effectuate service.   Instead, they essentially argue that this failure to serve should be forgiven because dismissal of certain actions as to only the un-served defendants would be a waste of judicial resources.   Further, as to the foreign entities Reckitt Benckiser

---

[32] While Reckitt states in their brief that three End Payors failed to serve Reckitt Benckiser Healthcare (UK) Ltd. and Reckitt Benckiser Group plc and two failed to serve any Defendant (<u>see</u> Reckitt's MTD EP Compl. p. 40, n.25), a review of the dockets in this matter reveals the following: The End Payors that have failed to serve Reckitt Benckiser Healthcare (UK) Ltd. and Reckitt Benckiser Group plc. are United Food & Commercial Workers Health & Welfare Fund (Dkt. No. 13-3229), A.F. of L.-A.G.C. Building Trades Welfare Plan (Dkt. No. 13-3545), Michigan Regional Council of Carpenters Employee Benefits Fund (Dkt. No. 13-1808), and I.B.E.W. 292 Health Care Plan (Dkt. No. 13-2454).   The End Payors that failed to serve any Defendant are Teamsters Health Services & Insurance Plan Local 404 (Dkt. No. 13-3451).

Healthcare (UK) Ltd. and Reckitt Benckiser Group plc, the End Payors argue that the 120-day time period for service prescribed by Rule 4(m) does not apply.

While it is true that the 120-day limit does not apply to service in a foreign country, the time period for service is not unlimited.  The Knit With v. Knitting Fever, Inc., 2010 WL 2788203, at *12 (E.D. Pa. July 13, 2010) (quoting United States ex rel. Thomas v. Siemens AG, 2010 WL 1688582, at *14 (E.D. Pa. Apr. 23, 2010)).  Courts often apply a general due diligence standard, which "considers the reasonableness of the plaintiff's effort and the prejudice to the defendant resulting from any delay."  Id.  Courts maintain significant discretion in extending the time period for service of the complaint, even in the absence of a showing of good cause.  Id. (citing Petrucelli v. Bohringer & Ratzinger, GmbH, 46 F.3d 1298, 1305 (3d Cir. 1995)).  Courts have granted extensions of time to serve where a defendant is already before the court in a consolidated action and "presumably the only result of a dismissal would be that the [ ] Plaintiffs would refile their complaint, resulting in a waste of judicial resources."  AIG Managed Market Neutral Fund v. Askin Capital Mgmt., L.P., 197 F.R.D. 104, 109 (S.D.N.Y. 2000) (citing In re Reliance Sec. Litig., 91 F. Supp. 2d 706, 719 (D. Del. 2000)).

While I agree that dismissing some of the End Payors' claims for failure to serve could potentially constitute a waste of judicial resources, as it would likely result in a refiling of the complaint, the End Payors have failed to even attempt to explain why service has not been effectuated.  There has been no attempt to establish good cause for failure to serve.  However, there is also no prejudice to Defendants, as Reckitt has received ample notice of this lawsuit from the other Plaintiffs and has been actively defending the suit.  Therefore, I find that the appropriate solution is to exercise discretion and allow an additional period of time for these End Payors to effectuate service.

IV.    **CONCLUSION**

For the reasons recited above, the following claims will be dismissed: Count III of the Direct Purchasers' complaint; a variety of state law claims brought in the End Payors complaint for lack of standing and failure to state a claim;[33] all claims against Reckitt Benckiser, Inc., Reckitt Benckiser LLC and Reckitt Benckiser Healthcare (UK) Ltd.; and the Direct Purchasers' claims against Reckitt Benckiser Group plc.  United Food & Commercial Workers Health & Welfare Fund, A.F.L.-A.G.C. Building Trades Welfare Plan, Michigan Regional Council of Carpenters Employee Benefits Fund, I.B.E.W. 292 Health Care Plan and Teamsters Health Services & Insurance Plan Local 404 are directed to effectuate service on all remaining Defendants within thirty days.

An appropriate Order follows.

---

[33] The antitrust claims under the laws of Arizona, District of Columbia, Illinois, Kansas, Maine, Massachusetts, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont and West Virginia will be dismissed.

The consumer protection claims under the laws of Arkansas, Arizona, District of Columbia, Idaho, Illinois, Kansas, Maine, Massachusetts, Missouri, Nebraska, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont and West Virginia will be dismissed.

The unjust enrichment claims brought under the laws of Arkansas, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maryland, Maine, Massachusetts, Missouri, Montana, Nebraska, New Jersey, New Hampshire, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia and Wyoming will be dismissed.